GEORGE L. CARNEY, JR., & others[1] vs. ATTORNEY GENERAL
& another.[2]

Suffolk. May 2, 2006. - July 13, 2006.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, & SOSMAN, JJ.

*Initiative. Constitutional Law,* Initiative petition. *Attorney General. Dog. Racing.*

In an action challenging the Attorney General's certification, pursuant to art. 48, The Initiative, Part II, § 3, of the Amendments to the Massachusetts Constitution, as amended by arts. 74, 81, and 108 of the Amendments, of an initiative petition, this court concluded that the petition violates the relatedness limitation of art. 48, in that the petition's proposal to expand existing criminal sanctions against cruelty to animals bears no meaningful operational relationship to the petition's proposal to establish laws that would abolish the established, highly regulated enterprise of parimutuel dog racing, and the aggregation in the petition of two very different sets of laws that the voters must accept or reject would operate to deprive voters of their right under art. 48 to enact a uniform statement of public policy through exercising a meaningful choice in the initiative process. [224-232]

CIVIL ACTION commenced in the Supreme Judicial Court for the county of Suffolk on February 14, 2006.

The case was reported by *Spina,* J.

*Joel A. Kozol* (*Lee H. Kozol & Marc D. Rie* with him) for the plaintiffs.

*Peter Sacks,* Assistant Attorney General (*Lorraine A. Goldenberg-Tarrow,* Assistant Attorney General, with him) for the defendants.

The following submitted briefs for amici curiae:

*Thomas R. Kiley* for Wonderland Greyhound Owners Association, Inc., & others.

*Bradley J. Butwin, Abby F. Rudzin, Samantha L. Hetherington, & Joseph D. Keller,* of New York, & *Jeffrey D. Hutchins* for Committee to Protect Dogs & another.

---

[1]Laetitia A. Carney, Maura J. Carney, and Gary M. Temple.
[2]Secretary of the Commonwealth.

MARSHALL, C.J. The plaintiffs, four Massachusetts voters, filed suit in the county court to quash the Attorney General's certification of Initiative Petition 05-05, entitled "An Act to protect dogs" (petition), and to enjoin the Secretary of the Commonwealth (Secretary) from placing the petition on the 2006 Statewide ballot. See art. 48, The Initiative, Part II, and The Referendum, Part III, of the Amendments to the Constitution of the Commonwealth.[3] If enacted into law by a majority of voters, the petition would dismantle the dog racing industry in Massachusetts by repealing the provisions of G. L. c. 128A that license and regulate dog racing in which wagering or betting occurs (parimutuel dog racing). It would also amend provisions of our criminal code by broadening criminal statutes that penalize dog fighting and the general neglect and abuse of dogs. Parimutuel dog racing has been legal in the Commonwealth for more than seventy years. See G. L. c. 128A, inserted by St. 1934, c. 374, § 3. In 2000, the voters rejected an initiative petition to outlaw parimutuel dog racing that was identical to the petition's dog racing ban.

The plaintiffs claim that by combining a controversial proposition (dismantling parimutuel dog racing) with "insignificant and non-controversial" amendments to existing criminal laws against animal fighting and cruelty to animals, the petition is a "smokescreen" designed to "obfuscate the issue and confuse the voters." As such, they contend, the petition is a "logrolling" measure that violates the "relatedness" limitation of art. 48.[4] They also claim that the petition violates art. 48 in that it contains only "local matters," effects a taking of property without compensation, and is in a form improper for submission to the voters.[5]

We conclude that the petition violates the relatedness limita-

---

[3]Unless otherwise stated, all references to art. 48 refer to art. 48 as amended by arts. 74, 81, and 108 of the Amendments to the Massachusetts Constitution.

[4]"Logrolling" in the sense employed by the plaintiffs is defined as "[t]he legislative practice of including several propositions in one measure or proposed constitutional amendment so that the legislature or voters will pass all of them, even though these propositions might not have passed if they had been submitted separately." Black's Law Dictionary 960 (8th ed. 2004).

[5]Article 48, The Initiative, Part II, § 2, provides that no measure be proposed by initiative petition "the operation of which is restricted to a particular town, city or other political division or to particular districts or

tion of art. 48. The plain wording of art. 48 and the context in which it was enacted demonstrate that the relatedness limitation is one of many restrictions on the popular initiative process intended to avoid confusion at the polls and to permit citizens to exercise a meaningful choice when voting to accept or reject a proposed law. Here, the petition's proposal to expand existing criminal sanctions against cruelty to animals bears no meaningful operational relationship to laws that would abolish parimutuel dog racing, an established, highly regulated enterprise. As we shall explain, the aggregation of these two very different sets of laws into one petition that the voter must accept or reject would operate to deprive voters of their right under art. 48 to enact a uniform statement of public policy through exercising a meaningful choice in the initiative process. Because we conclude that the petition violates the relatedness limitation of art. 48, it is unnecessary to consider the plaintiffs' other challenges.

We remand the case to the county court for the entry of a judgment declaring that the Attorney General's certification of the petition is not in compliance with the limitations of art. 48 and enjoining the Secretary from taking steps to place the measure on the ballot in the 2006 Statewide election.

1. *Background.* We summarize from the record submitted by the parties pursuant to the single justice's reservation and report.[6]

The petition would first amend various sections of G. L. c. 272 that impose criminal sanctions against those who mistreat and neglect animals. It would also amend G. L. c. 128A to do away with the parimutuel dog racing industry regulated by that statute.[7] We describe the salient provisions of the petition,

localities." Article 48 also prohibits the proposal of an initiative petition that is "inconsistent" with "[t]he right to receive compensation for private property appropriated to public use . . . ."

[6]The record includes a statement of agreed facts. We acknowledge the Attorney General's reservation that the statement of agreed facts "does not necessarily constitute agreement that the fact was officially noticeable by the Attorney General during the certification process, or was actually officially noticed by him."

[7]Section 1 of the petition recites the following "Declaration of purpose:" "The citizens of Massachusetts have special concerns for dogs, and find that the provisions of this Act, as recommended by the Animal Rescue League of

together with the current laws the various sections of the petition would modify.

a. Sections 2 and 3 of the petition would, effective January 1, 2007, add or amend various sections of our criminal code, as follows:

(1) by adding a new criminal measure providing prison terms and fines for those convicted of "willfully, maliciously or with reckless disregard . . . injur[ing], disabl[ing] or otherwise mistreat[ing]" a military dog, a police dog owned by a State or Federal law enforcement agency, or a "service dog."[8] The new law proposes criminal penalties identical to those set by G. L. c. 272, § 77, the general animal neglect and mistreatment statute,[9] but potentially greater than those set by G. L. c. 272, § 77A, which penalizes the wilful mistreatment of dogs owned by Commonwealth law enforcement agencies.

(2) by amending the statutes prohibiting animal fighting to specify that the term "dogs" used therein includes "dogs or puppies that are used or kept for breeding or producing for, or to be used, exchanged, sold or exported in association with, or in support or furtherance of, dog fighting"; by criminalizing the breeding of dogs for fighting; and by permitting the search for and seizure of dog fighting paraphernalia. Current criminal statutes do not address the breeding of dogs for fighting, see G. L. c. 272, § 88 (search warrant), § 89 (warrantless search), § 91 (forfeiture), and § 94 (punishment), or address the issue of dog fighting paraphernalia.

---

Boston, the Massachusetts Society for the Prevention of Cruelty to Animals, and the Humane Society of the United States, will further protect dogs and puppies in the state."

[8]The petition defines "service dog" as "any guide dog or signal dog individually trained to do work or perform tasks for the benefit of an individual with a disability, including, but not limited to: guiding individuals with impaired vision, alerting individuals with impaired hearing to intruders or sounds, providing minimal protection or rescue work, pulling a wheelchair, or fetching dropped items." Currently, G. L. c. 272, § 85B, permits recovery of damages from third parties who steal or attack "assistance animal[s]," a term the statute does not define.

[9]Those penalties, which recently were increased, include "imprisonment in the state prison for not more than 5 years or imprisonment in the house of correction for not more than 2 1/2 years or by a fine of not more than $2,500, or by both such fine and imprisonment." G. L. c. 272, § 77, as amended through St. 2004, c. 319, § 4.

(3) by requiring that dogs and puppies confiscated in the enforcement of laws against dog fighting be forfeited to the custody of a humane society. Under current law, fighting animals that are forfeited are required to be killed within twenty-four hours of seizure. See G. L. c. 272, § 91.

b. Section 4 of the petition does not address any criminal statutes. It would repeal the provisions of existing law that permit and license parimutuel dog racing, prohibit the State Racing Commission from licensing parimutuel dog racing anywhere in the Commonwealth, and provide civil penalties for violations. Section 4 would amend the regulatory scheme of G. L. c. 128A to apply only to horse racing. At present, parimutuel dog racing is licensed in Suffolk and Bristol Counties[10] and may also be licensed in Hampden County. See G. L. c. 128A, § 3 (*g*).[11] The industry is heavily regulated with respect to wagering, employees, the treatment and veterinary care of racing dogs, and other matters. See G. L. c. 128A. The abolition of dog racing would take effect on January 1, 2008.

There is no dispute that § 4 of the petition is identical to an initiative petition entitled "An Act Relative to dog racing in the commonwealth" that was submitted to voters in the 2000 Statewide election and defeated by a margin of 48.59 per cent to 46.70 per cent.[12] The remaining provisions of the present petition have not previously appeared on the ballot.[13]

2. *Certification.* On or before the first Wednesday of August, 2005, eleven qualified voters[14] filed the prospective petition with the Attorney General. On August 15, 2005, and August 29, 2005, representatives of Massasoit Greyhound Association, Inc. (Massasoit), and Taunton Dog Track, Inc. (Taunton), each

---

[10]The Suffolk and Bristol County parimutuel dog racing tracks also have simulcast rights. See, e.g., G. L. c. 128C, § 2 (1)-(3). These simulcast rights are set to expire on December 31, 2006. See St. 2006, c. 54, § 12 (approved April 6, 2006).

[11]Certain geographical restrictions are set to expire on December 31, 2006. See St. 2006, c. 54, § 12 (approved April 6, 2006).

[12]The percentage of voters not voting on the 2000 initiative measure was 4.71 per cent.

[13]Section 5 of Petition 05-05, the final section, is a severability provision.

[14]Two of the eleven voters were purportedly acting on behalf of organizations. The plaintiffs do not seek to invalidate these signatures or otherwise argue that they are improper.

licensed by the State Racing Commission to conduct parimutuel dog racing, wrote to the Attorney General opposing certification of the petition. On September 7, 2005, the Attorney General certified to the Secretary that, among other qualifications, the petition "contains only subjects that are related or are mutually dependent." See art. 48, The Initiative, II, § 3.[15] In accordance with art. 48, he also prepared and sent to the Secretary a "fair, concise" summary of the petition for transmission to the voters. See id.[16] That same day, the Attorney General sent a detailed letter to Massasoit and Taunton stating, in essence, that their objections to the petition were groundless.

On receipt of the certification letter and summary from the Attorney General, the Secretary prepared and distributed blank circulation forms for the petitioners to gather additional signatures sufficient for submission of the petition to the Legislature. See id. On or before the first Wednesday in December, 2005, the proponents of the petition submitted the required additional signatures to the Secretary, who then submitted the petition to the clerk of the House of Representatives. See art. 48, The Initiative, Part II, § 4, and Part V, § 1. The Secretary has stipulated that if, pursuant to art. 48, the proponents gather sufficient additional signatures by the first Wednesday of July, 2006, he intends to include the petition in the Information to Voters Guide being printed this summer, see

---

[15]In relevant part, art. 48, The Initiative, Part II, § 3, provides: "Such petition shall first be signed by ten qualified voters of the commonwealth and shall then be submitted to the attorney-general not later than the first Wednesday of the August before the assembling of the general court into which it is to be introduced, and if he shall certify that the measure and the title thereof are in proper form for submission to the people, and that the measure is not, either affirmatively or negatively, substantially the same as any measure which has been qualified for submission or submitted to the people at either of the two preceding biennial state elections, and that it contains only subjects not excluded from the popular initiative and which are related or which are mutually dependent, it may then be filed with the secretary of the commonwealth."

[16]The summary states that the proposed law would "(1) prohibit any dog racing or racing meeting in Massachusetts where any form of betting or wagering on the speed or ability of dogs occurs; (2) make it a crime to harm a military, police, or service dog while committing a felony; and (3) make it a crime to use or keep dogs for breeding for fighting, and allow law enforcement officials to seize such dogs and property used in the violation of laws against dog fighting, and seek a court order for their forfeiture."

art. 48, General Provisions, Part IV, and to add the petition to the ballot for the people's consideration during the 2006 Statewide election in November.

On February 14, 2006, the plaintiffs filed their complaint for certiorari and mandamus in the county court.[17] The single justice reserved and reported the case to the full court on the complaint, the statement of agreed facts, and other documents.[18]

3. *Discussion.* The plaintiffs claim that the petition is a collection of loosely related provisions designed to mislead voters into abolishing parimutuel dog racing in Massachusetts. The Attorney General counters that the sections of the petition all relate generally to "promoting the more humane treatment of dogs."[19] Our point of departure is the plain wording of art. 48 itself, which we construe "in the light of the conditions under which it was framed, the ends designed to be accomplished, the benefits expected to be conferred, and the evils hoped to be remedied." *Loring* v. *Young,* 239 Mass. 349, 372 (1921). See *Opinion of the Justices,* 324 Mass. 746, 749 (1949), quoting *Attorney Gen.* v *Methuen,* 236 Mass. 564, 573 (1921) ("An amendment to the Constitution is one of the most solemn and important of instruments. . . . Its words should be interpreted in 'a sense most obvious to the common understanding at the time of its adoption,' because it is proposed for public adoption and must be understood by all entitled to vote"). We are not

---

[17]As to the plaintiffs, the parties' statement of agreed facts notes only that George L. Carney, Jr., is a stockholder of Massasoit and Taunton, which are Massachusetts corporations licensed by the State Racing Commission to conduct dog racing meetings where betting or wagering is allowed and granted associated simulcast rights. On its 2005 license application to the racing commission, submitted as an exhibit to the statement of agreed facts, Massasoit lists Carney as its president, clerk, treasurer, and director, and the president, clerk, treasurer, and director of Taunton. Massasoit's license application also lists Laetitia A. Carney and Maura J. Carney as directors of Massasoit and Maura J. Carney as a director of Taunton. Gary M. Temple is a registered voter in Worcester County.

[18]We acknowledge the amicus briefs filed by the Committee to Protect Dogs and The Humane Society of the United States; and the Wonderland Greyhound Owners Association, Inc., William H. O'Donnell, and Albert G. Smith, Jr.

[19]The formulation of the petition's purpose that the Attorney General advances here is broader than that enunciated by the petition's sponsors, which is to "further protect" dogs. See note 7, *supra.*

free to temper the stringent formal limitations adopted by the people to ensure the integrity of the initiative process. See *Opinion of the Justices*, 422 Mass. 1212, 1219 (1996) ("This court has required strict adherence to the constitutional requirements for initiative petitions. They are not mere technicalities"). "We reject any restrictive reading of art. 48, as amended, that results in a failure to give effect to the purpose for which its words were chosen." *Hurst* v. *State Ballot Law Comm'n*, 427 Mass. 825, 828 (1998), quoting *Tobias* v. *Secretary of the Commonwealth*, 419 Mass. 665, 674 (1995).

An initiative petition may include more than one subject, provided that the joined subjects have "a common purpose to which each element is germane or, at least, to which it 'cannot rightly be said to be unrelated.' " *Massachusetts Teachers Ass'n* v. *Secretary of the Commonwealth*, 384 Mass. 209, 221 (1981), quoting *Opinion of the Justices*, 309 Mass. 555, 561 (1941). The petition need not evidence a "strict internal consistency." *Mazzone* v. *Attorney Gen.*, 432 Mass. 515, 529 (2000). On the other hand, its purported common purpose may not be so broad as to render the relatedness limitation "meaningless." *Massachusetts Teachers Ass'n* v. *Secretary of the Commonwealth*, *supra* at 219.

Under art. 48, the Attorney General serves as the first line of defense against confusing, misleading, or otherwise invalid initiative provisions. See *Yankee Atomic Elec. Co.* v. *Secretary of the Commonwealth*, 402 Mass. 750, 757 (1988). He must "assess what a proposed initiative does in its various aspects or subjects." *Massachusetts Teachers Ass'n* v. *Secretary of the Commonwealth*, *supra* at 221. He is obligated under art. 48 "to ferret out obviously improper initiative petitions." See *Yankee Atomic Elec. Co.* v. *Secretary of the Commonwealth*, *supra*. The Attorney General concedes that this obligation requires him to consider, at minimum, " 'legislative' facts," which he defines as "whether one could reasonably believe that various subjects relate to a common purpose." This narrow perspective, focused solely on the initiative's proponents, fails to give full effect to art. 48 by ignoring the Attorney General's carefully crafted obligation to protect the voters, who must ultimately "legislate" the proposal.

The relatedness limitation requires the Attorney General to scrutinize the aggregation of laws proposed in the initiative petition for its impact at the polls. At some high level of abstraction, any two laws may be said to share a "common purpose." The salient inquiry is: Do the similarities of an initiative's provisions dominate what each segment provides separately so that the petition is sufficiently coherent to be voted on "yes" or "no" by the voters? That is the crux of the relatedness controversy. See, e.g., *Opinion of the Justices*, 422 Mass. at 1220 (parties dispute whether common purpose of initiative petition is characterized broadly as "to make Massachusetts government more accountable to the people" or more narrowly as "legislative accountability"); *Massachusetts Teachers Ass'n v. Secretary of the Commonwealth, supra* at 220-221 (assessment of relatedness turns on whether initiative petition is characterized broadly as provision for limitation of taxes or more narrowly as provision concerned with local tax rates and cost of local government). This question is not susceptible to bright-line analysis.

For additional insight into the relatedness limitation, we turn to the proceedings of the constitutional convention of 1917-1918, from which art. 48 emerged for consideration by the voters, and from which we may discern "the conditions under which art. 48 came into existence, and how it appears then to have been received and understood by the convention" and, ultimately, by the voters. *Cohen* v. *Attorney Gen.*, 357 Mass. 564, 572 (1970). In the context of the entire debate surrounding adoption of an initiative and referendum amendment, the relatedness limitation emerges as one of a number of compromise measures intended to place limits on the initiative as a means to forestall "abuse" of the process. See *Hurst* v. *State Ballot Law Comm'n*, 427 Mass. 825, 828 (1998).

The original draft of the measure that became art. 48, approved by the bare majority of the Committee on Initiative and Referendum, contained no relatedness provision. See 2 Debates in the Massachusetts Constitutional Convention 1917-1918, 4-6 (1918) (Debates). That draft was extensively debated and revised over weeks of deliberation that captured the attention of the press and the general public. See *Cohen* v. *Attorney Gen., supra* at

571. During the debates, Mr. Luce of Waltham introduced an amendment that stated, "No proposed law shall contain more than one subject." Debates, *supra* at 856. Mr. Luce was a critic of the original draft amendment. His proposal followed his earlier admonition about the dangers of "logrolling," see note 4, *supra*, as demonstrated by the experience of other initiative States. He denounced "the iniquities of log-rolling" and chided the principal sponsor of the initiative proposal, Mr. Walker of Brookline, for "put[ting] in here not a word to prevent log-rolling." *Id.* at 567, 664 (remarks of Mr. Luce).[20] Other delegates also expressed concern that the drafts of the initiative and referendum amendment contained no check on logrolling. See, e.g., *id.* at 11-12 (views of dissenting members of Commission on Initiative and Referendum, protesting that draft amendment contains "no assurance" that initiative proposal will not be "as full of tricks and jokers, as alluring a combination of what is popular with what is desired by selfish interests as the propos-ers of the measures may choose"); *id.* at 537 (remarks of Mr. Balch, proposing establishment of "special body" that would, among other things, certify that initiative proposal "touches only one subject-matter, or subject-matters so related as not fairly to require separation"). See also *id.* at 701 (remarks of Mr. Churchill: "it ought to be clear to us that the more details, the more complications we have in the proposition submitted to the voters, the more difficult it is for them to act upon it").

On submission of the Luce proposal, Mr. Quincy of Boston rose to state that the subject it concerned had been "discussed

---

[20]Mr. Luce went on to state: "But, sir, you now invite the self-seekers who cannot get their legislation through the General Court to turn to the people whom they may wheedle or deceive into granting the privileges that our representatives never would permit. I have time to refer but incidentally to the measures that become law through the blind wording of titles or to catchy provisions, as illustrated by a case in Oregon, where, in order to secure the passage of the single tax, there was hitched to the front of it, like a locomo-tive to the front of a freight train, a proposal that there should be no more poll or head taxes. The important part of them had been abolished for years, but nevertheless that proposal hauled the heavy freight through and put into the Constitution of Oregon the single-tax proposition that the people had previ-ously rejected." 2 Debates in the Massachusetts Constitutional Convention 1917-1918, 567 (1918) (Debates).

between delegates" and that in his opinion revision of the amendment to include the phrase "shall not contain unrelated subjects" would "convey[] the proper idea" and would not be "objectionable to the majority." Debates, *supra* at 856. Mr. Luce readily agreed to the modification, noting that he borrowed the language for his own proposed relatedness limitation from the Constitutions of other States but that Mr. Quincy "has conceived a happier phraseology than that usually found in other States." *Id.* at 857. See generally Downey, Direct Democracy, A Survey of the Single Subject Rule as Applied to Statewide Initiatives, 13 J. Contemp. Legal Issues 579 (2004). The Quincy amendment was adopted, see Debates, *supra*, and appeared in an amended draft initiative and referendum amendment under the "Excluded Matters" provision. *Id.* at 911, line 209. The Committee on Form and Phraseology, on its own initiative, moved the relatedness limitation from its "isolated" position and incorporated it into the section of the final draft initiative amendment concerning the Attorney General's certification duties, see *id.* at 960 (remarks of Mr. Loring). See also *id.* at 953, lines 43-44 (Committee on Form and Phraseology draft requiring Attorney General's certification that initiative petition "contain[] only subjects which are related or which are mutually dependent"). The relatedness limitation was adopted by the delegates in its current form, see *id.* at 1051, lines 61-62, and, subsequently, by the people.

We cannot overlook the context in which the relatedness amendment was agreed to. In particular, a great deal of debate centered on the need to add provisions to the original draft amendment that would foreclose the kinds of abuses and misapplications of initiative petitions that the delegates determined had occurred in other States. A recurring topic of concern was the possibility that well-financed "special interests" would exploit the initiative process to their own ends by packaging proposed laws in a way that would confuse the voter. See, e.g., *id.* at 131 (remarks of Mr. Lummus, on intrusion of "private interests" into initiative process); *id.* at 152 (remarks of Mr. Underhill, on attempts to influence voters in Oregon initiative elections); *id.* at 495-496 (remarks of Mr. Bartlett, on domination of California initiative process by monied interests). Cf.

Debates, *supra* at 875-876 (remarks of Mr. Walcott, on South Dakota's attempt to eliminate practice of paid signature gatherers for initiative petitions). One means of exploiting the initiative that the delegates denounced was the practice of "hitching" alluring provisions at the beginning of an initiative petition and burying more controversial proposals farther down. See note 20, *supra*.

The delegates sought solutions to potential misuse of the petition and referendum process, *not* in changes to the original draft that would penalize wrongdoers, but by adding gatekeeping measures that would cull out misleading or confusing initiative measures. A comparison of the original 181-line draft amendment with the 411-line final draft makes these changes readily apparent. The final draft of the initiative amendment approved by the majority of delegates for submission to the people contained many provisions for the formal review of initiatives that were absent from the original draft. They include addition of a certification role for the Attorney General, expansion of the type of individual rights excluded from the initiative process, resolution by the Legislature of conflicting and alternative petition measures, and, among others, the relatedness limitation. Compare Debates, *supra* at 2-6 (original draft amendment) with Debates, *supra* at 1050-1057 (final draft). The resulting draft submitted for the people's approval was one the delegates intended, in the words of one, to establish an initiative process that "makes, not for a hasty, snap, popular judgment, but for the expression of that sound and settled popular will, fair to minorities, sane as to its consequences, which in a democracy ought to govern." *Id.* at 941 (remarks of Mr. Lummus). See *Bates* v. *Director of the Office of Campaign & Political Fin.*, 436 Mass. 144, 159 n.24 (2002) ("The desire of Massachusetts citizens to place significant limits on their initiative powers in art. 48 resulted in a constitutional amendment that as a whole is considerably more modulated than are the initiative amendments to some other States' Constitutions adopted at about the same time"); *Hurst* v. *State Ballot Law Comm'n*, 427 Mass. 825, 828 (1998) ("Article 48 provides means for the public to participate directly in the lawmaking process, but also safeguards against abuse of those means by special interests to

invalidate acts by the people's elected representatives in the Legislature. The State Constitutional Convention of 1917-1918 sought a balance between competing impulses toward direct versus representative democracy").

Read in its entirety, then, art. 48 provides a mechanism for exercising the right of popular lawmaking that carefully constructs safeguards against potential voter confusion in the initiative process. When considering the question of relatedness, we must give full effect to the balance struck by the amendment. We recognize that every initiative petition enables the majority to express its will apart from the process of representative democracy. We also recognize that the initiative does not, and cannot, turn every voter into a legislator. Unlike a legislator, the voter has no opportunity to modify, amend, or negotiate the sections of a law proposed by popular initiative.[21] He or she cannot sever the unobjectionable from the objectionable. He or she must vote the measure "up or down" as one piece. The voter may also, of course, choose not to vote on an initiative proposal at all. But this alternative merely favors the eventual winning position. It is hardly a choice that public policy wishes to encourage.

The language, structure, and history of art. 48 all suggest that any initiative presenting multiple subjects may not operate to deprive the people of a "meaningful way" to express their will. See *Opinion of the Justices*, 422 Mass. 1212, 1221 (1996). It is not enough that the provisions in an initiative petition all "relate" to some same broad topic at some conceivable level of abstraction. *Id.* To clear the relatedness hurdle, the initiative petition must express an operational relatedness among its substantive parts

---

[21]This point was made by several delegates to the Constitutional Convention of 1917-1918. See, e.g., Debates, *supra* at 13 (dissenting members: "Voters have no choice save to pass or reject a measure exactly as framed by the petitioners. It may contain both good and bad provisions, but both must be accepted or rejected without amendment. . . . Very few legislative measures are introduced in form or phrase deserving of final adoption"); *id.* at 133 (remarks of Mr. Lummus: "Did you ever hear of an unamendable motion, — a motion to which the proposer was authorized to give final and conclusive form, and, at his own will and from his own narrow and perhaps selfish standpoint, to refuse to change even upon the strongest proof of necessity?"); *id.* at 531-533 (remarks of Mr. Balch: initiative process would destroy institution of "deliberative government" for process of "compulsory deliberation").

that would permit a reasonable voter to affirm or reject the entire petition as a unified statement of public policy. A broader interpretation of the common purpose requirement would undercut the very foundations of the relatedness limitation.

Here, there is no meaningful operational relationship between §§ 2 and 3, which would amend criminal statutes penalizing animal abuse, and § 4, which would dismantle the legitimate business of parimutuel dog racing.[22] The proposed modification to our criminal laws might result in more convictions or longer sentences for animal abuse. But, as the documents of record demonstrate, abolishing the business and entire regulatory scheme of parimutuel dog racing will certainly affect track owners and employees, spectators, vendors, contractors, dog owners and trainers, concessionaires, and the commercial base of at least two Massachusetts towns. The voter who favors increasing criminal penalties for animal abuse should be permitted to register that clear preference without also being required to favor eliminating parimutuel dog racing. Conversely, the voter who thinks that the criminal penalties for animal abuse statutes are strong enough should not be required to vote in favor of extending the reach of our criminal laws because he favors abolishing parimutuel dog racing.[23] Significantly, in none of the petitions cited by the Attorney General do we find the same mixture of criminal law and administrative overhaul. See, e.g., *Albano* v. *Attorney Gen.*, 437 Mass. 156, 161 (2002) (constitutional amendment banning same-sex marriage would have uniform application to many different statutes); *Mazzone* v. *Attorney Gen.*, 432 Mass. 515, 528-530 (2000) (provision

---

[22]We do not question the power of the Legislature and the people through the initiative process to abolish animal racing involving betting or wagering, see *Selectmen of Topsfield* v. *State Racing Comm'n*, 324 Mass. 309 (1949), or to enact robust criminal and civil laws for the protection of animals. See *Opinion of the Justices*, 286 Mass. 611 (1934).

[23]The brief submitted by the Attorney General circumvents this point by stating that "voters who have . . . mixed feelings" about the separate sections of the petition "must be trusted to sort them out before they vote." As we stated above, voters, unlike legislators, are not afforded the opportunity to participate in the deliberative process of debate and compromise to craft a statement of public policy that they can endorse without significant reservation. They have no meaningful way to "sort out" their mixed feelings about an initiative bill short of voting it up or down as a whole.

expanding drug treatment programs in Commonwealth and, inter alia, providing program funding through enhanced fines for drug violations related); *Massachusetts Teachers Ass'n* v. *Secretary of the Commonwealth*, 384 Mass. 209, 218-221 (1981) (measure capping property and personal tax assessments and freeing cities and town from certain expenditures mandated by statute, among other provisions, "directly or indirectly" limited to common purpose of tax reduction); *Opinion of the Justices*, 309 Mass. 555, 560-561 (1941) (education, publication, and physician conduct provisions of initiative all related to prevention of pregnancy or conception). See also *Opinion of the Justices*, 422 Mass. at 1220-1221 (no common purpose discernible between measures to increase legislative accountability and provision permitting Inspector General access to records of commissioner of veterans services). The Legislature has not been recalcitrant in strengthening laws for the protection of animals, see, e.g., note 9, *supra*, and there is incontrovertible evidence that the people have recently ratified the Legislature's decision to permit dog racing. While the petitioners posit that the abolition of parimutuel dog racing and the enhancement of animal abuse laws form a seamless whole, the operative question we must answer is whether their petition offers fellow citizens a meaningful choice to express a uniform public policy.

Neither the Attorney General nor this court is required to check common sense at the door when assessing the question of relatedness. The relatedness limitation of art. 48 must not be permitted to drift from its intent to secure to voters the right to enact a uniform statement of public policy through exercising a meaningful choice in the initiative process.

4. *Conclusion.* Because we conclude that Petition 05-05 violates the relatedness limitation of art. 48, we do not consider the plaintiffs' other claims. We remand the case to the county court for the entry of a judgment declaring that the Attorney General's certification of Petition 05-05 is not in compliance with the limitations of art. 48 and enjoining the Secretary from taking steps to place the measure on the ballot in the 2006 Statewide election.

*So ordered.*