NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-12064

STEPHANIE GRAY & others[1]  vs.  ATTORNEY GENERAL & another.[2]


Suffolk.     May 2, 2016. - July 1, 2016.

Present:  Gants, C.J., Spina, Cordy, Botsford, Duffly, Lenk, &
Hines, JJ.


Initiative.  Constitutional Law, Initiative petition.  Attorney
    General.  Education, Standards.



Civil action commenced in the Supreme Judicial Court for
the county of Suffolk on January 22, 2016.

The case was reported by Cordy, J.


Thaddeus A. Heuer (Andrew M. London with him) for the
plaintiffs.
Juliana deHaan Rice, Assistant Attorney General (Michael B.
Firestone, Assistant Attorney General, with her) for the
defendants.


BOTSFORD, J.  The Attorney General has certified an

initiative petition that concerns, and seeks to end, the use of

---

[1] Robert Antonucci, Bill Walczak, Dianne Kelly, B. John
Dill, Kalimah Rahim, April West, Beverly Holmes, Jacinthe
Albani, and Vanessa Calderon-Rosado.

[2] Secretary of the Commonwealth.

the Common Core State Standards (common core standards) in defining the educational curriculum of publicly funded elementary and secondary students in the Commonwealth.  The petition also concerns the standardized testing process used in Massachusetts school districts:  it would require the Commissioner of Elementary and Secondary Education (commissioner) to publicly release each year all of the questions and other "test items" included in the prior year's comprehensive assessment tests that all publicly funded students in elementary and secondary schools are required to take.  The plaintiffs, a group of Massachusetts voters, challenge the Attorney General's certification of the petition and seek to enjoin the Secretary of the Commonwealth (Secretary) from placing the proposed measure on the 2016 Statewide ballot on a number of grounds.  We conclude, as the plaintiffs argue, that the Attorney General's certification of Initiative Petition 15-12 did not comply with art. 48, The Initiative, II, § 3, of the Amendments to the Massachusetts Constitution because it contains provisions that are not related or mutually dependent.[3]  It is therefore unnecessary to consider the plaintiffs' other challenges.

---

[3] All references in this opinion to art. 48, The Initiative, II, § 3, of the Amendments to the Massachusetts Constitution refer to art. 48 as amended by art. 74 of those amendments.

1.  Background.[4]  The common core standards were developed in 2009 as part of a State-led initiative that included governors and commissioners of education from forty-eight States, two territories, and the District of Columbia working as members of the National Governors Association Center for Best Practices and the Council of Chief State School Officers.  The purpose of the initiative was to create consistent learning goals to ensure that all students graduate from high school with the requisite preparation for "college, career, and life."  See Development Process, Common Core State Standards Initiative, http://www.corestandards.org/about-the-standards/development-process/ [https://perma.cc/ULU2-CG62].  The common core standards define learning objectives for each elementary and secondary school grade level through the final year of high school, with the goal that every student will be able to meet expectations for what every child should know by the time he or she graduates from high school.  See Frequently Asked Questions, Common Core State Standards Initiative, http://www.corestandards.org/wp-content/uploads/FAQ.pdf [https://perma.cc/W3VR-PQLN].

On July 21, 2010, the Board of Elementary and Secondary Education (board) voted, pursuant to its authority under G. L.

---

[4] The facts are taken from the statement of agreed facts and exhibits submitted by the parties pursuant to the single justice's reservation and report.

c. 69, §§ 1D and 1E, to adopt the common core standards and replace the then-current Massachusetts curriculum frameworks in English language arts and mathematics; the vote to adopt was contingent on "augmenting and customizing" the common core standards "within the [fifteen] percent allowance"[5] for State-specific content (July vote).  The board directed the commissioner to present recommendations for modifying and augmenting the common core standards with State-specific content within the permissible fifteen per cent range no later than October, 2010, after which the commissioner was to solicit public comment.  The commissioner also was directed to propose to the board a final version of the standards, including State-specific content, and upon the board's approval, they would become the new "Massachusetts Curriculum Frameworks for English Language Arts and Mathematics."  On December 21, 2010, following a public comment period, the board voted unanimously to adopt the proposed new "Massachusetts Curriculum Framework for English Language Arts and Literacy, Incorporating the Common Core State Standards," and the proposed new "Massachusetts Curriculum

---

[5] If a State, through an authorized governmental entity (here, the board) adopts the Common Core State Standards (common core standards), the State has agreed that they will account for eighty-five per cent of the total number of standards in a particular subject area, which provides the State with the option to adopt up to fifteen per cent in additional standards. See State Adoption of the Common Core State Standards: the 15 Percent Rule, at 1 (Mar. 2012), available at http://files.eric.ed.gov/fulltext/ED544664.pdf [https://perma.cc/2UFD-NKVX].

Framework for Mathematics, Incorporating the Common Core State Standards" (December vote).

On or before August 5, 2015, sixteen qualified voters (petitioners) submitted Initiative Petition 15-12 to the Attorney General. On September 2, 2015, the Attorney General certified to the Secretary that the petition is in the proper form and meets the requirements of art. 48; that the measure is not substantially the same as any measure that had been qualified for submission to the people at either of the two preceding biennial State elections; and that the initiative petition contains only subjects that are related or mutually dependent and which are not excluded from the initiative process pursuant to art. 48, The Initiative, II, § 2. The Attorney General also prepared a summary of the initiative petition to be used in the process for gathering additional signatures, and provided the summary to the Secretary. On or before December 2, 2015, the petitioners submitted to the Secretary forms containing sufficient additional signatures to require that the Secretary transmit the petition to the Legislature. The Secretary then transmitted the petition to the Clerk of the House of Representatives, and the petition was assigned bill No. H.3929, entitled "An Act relative to ending common core education standards." The Legislature has not enacted the measure that the petition proposes. If the petitioners submit

the requisite number of signatures to the Secretary by July 6, 2016, the Secretary intends to include the petition in the Information for Voters Guide and to include the substance of the proposed measure on the November, 2016, ballot.

On January 22, 2016, the plaintiffs filed their complaint in the county court, seeking relief in the nature of certiorari and mandamus; specifically, they seek to quash the certification of the petition and to enjoin the Secretary from including the substance of the proposed measure on the November, 2016, Statewide ballot. After the parties filed a statement of agreed facts, the single justice reserved and reported the case for consideration by the full court.

The petition contains six sections.[6] Section 1 would rescind the board's July vote to adopt, contingently, the common core standards, and would immediately "restore" the Massachusetts curriculum frameworks in English language arts and mathematics that were in effect prior to July 21, 2010. Section 2 of the petition would amend the second paragraph of G. L. c. 69, § 1D (§ 1D),[7] to require that (1) the board include, in

_____

[6] The full text of Initiative Petition 15-12 is set forth in the Appendix to this opinion.

[7] The second paragraph of G. L. c. 69, § 1D (§ 1D), as currently in effect, provides:

   "The board shall direct the commissioner to institute a process to develop academic standards for the core

the process for developing academic standards, committees comprised of "teachers and academics" from Massachusetts public and private colleges and universities; and (2) the commissioner copyright the "frameworks," granting permission for use only for noncommercial, educational uses.

Section 3 of the petition would further amend the second paragraph of § 1D by adding a provision that would (1) require the board to create three review committees -- one for mathematics, one for science and technology, and one for English -- with the members of each committee to be appointed by the Governor from public and private research universities in Massachusetts; and (2) prohibit the board from approving any "frameworks" unless the pertinent review committee "warrant[s]

---

subjects of mathematics, science and technology, history and social science, English, foreign languages and the arts. The standards shall cover grades kindergarten through twelve and shall clearly set forth the skills, competencies and knowledge expected to be possessed by all students at the conclusion of individual grades or clusters of grades. The standards shall be formulated so as to set high expectations of student performance and to provide clear and specific examples that embody and reflect these high expectations, and shall be constructed with due regard to the work and recommendations of national organizations, to the best of similar efforts in other states, and to the level of skills, competencies and knowledge possessed by typical students in the most educationally advanced nations. The skills, competencies and knowledge set forth in the standards shall be expressed in terms which lend themselves to objective measurement, define the performance outcomes expected of both students directly entering the workforce and of students pursuing higher education, and facilitate comparisons with students of other states and other nations."

by a two-thirds vote that the frameworks are equivalent to the standards of the most educationally advanced nations as determined by the Trends in Mathematics and Sciences Study."[8]

Section 4 of the petition would amend the third paragraph of G. L. c. 69, § 1I (§ 1I),[9] to require, with respect to the

---

[8] The Trends in International Mathematics and Sciences Study (TIMSS) is a series of international assessments of the mathematics and science knowledge of students in several countries. The National Center for Education Statistics of the United States Department of Education administers the TIMSS in the United States. See Institute of Education Sciences, National Center for Education Statistics, Trends in International Mathematics and Science Study (TIMSS), Overview, http://nces.ed.gov/timss/ [https://perma.cc/7D5S-FEPC]. Although section 3 of the initiative petition does not include the word "international," we assume that the petition intends to refer to TIMSS as the proposed benchmark for academic standards.

[9] General Laws c. 69, § 1I (§ 1I), provides in relevant part:

> "The board shall adopt a system for evaluating on an annual basis the performance of both public school districts and individual public schools. . . .

> "The system shall be designed both to measure outcomes and results regarding student performance, and to improve the effectiveness of curriculum and instruction. In its design and application, the system shall strike a balance among considerations of accuracy, fairness, expense and administration. The system shall employ a variety of assessment instruments on either a comprehensive or statistically valid sampling basis. Such instruments shall be criterion referenced, assessing whether students are meeting the academic standards described in this chapter. . . . Such instruments shall provide the means to compare student performance among the various school systems and communities in the commonwealth, and between students in other states and in other nations, especially those nations which compete with the commonwealth for employment and economic opportunities. . . .

comprehensive diagnostic assessments of individual students conducted on an annual basis,[10] the annual release, before the start of each school year, of all of the previous academic year's test items, including all test questions, all constructed responses, and all essays, for each grade in which the diagnostic assessment tests were administered and for each subject tested, "[i]n order to better inform the teachers and administrators about the diagnostic assessments."[11]

---

"In addition, comprehensive diagnostic assessment of individual students shall be conducted at least in the fourth, eighth and tenth grades. Said diagnostic assessments shall identify academic achievement levels of all students in order to inform teachers, parents, administrators and the students themselves, as to individual academic performance. The board shall develop procedures for updating, improving or refining the assessment system."

[10] The Massachusetts Comprehensive Assessment System (MCAS) test qualifies as a "comprehensive diagnostic assessment" and is "used as the high school competency determination, or graduation requirement." Student No. 9 v. Board of Educ., 440 Mass. 752, 759 (2004). The MCAS test was administered initially in 1998, and, beginning with the graduating class of 2003, high school students must achieve a set minimum scaled score on the English language arts and mathematics grade 10 MCAS test as a graduation requirement. Id.

[11] The final sections of the initiative petition provide that "the several provisions of this Act" are independent and severable (section 5), and that "[t]his Act" is to take effect "immediately upon coming law" (section 6). We do not discuss either of these sections further except to note that the severability provision in section 5 is part of the measure proposed in the petition, and would only be operative if enacted into law. This severability provision does not authorize this

The plaintiffs allege in their complaint that Initiative Petition 15-12 was improperly certified by the Attorney General because the petition does not comply with art. 48 in several respects. In particular, the plaintiffs claim that (1) the petition contains subjects that are neither related nor mutually dependent in violation of art. 48, The Initiative, II, § 3; (2) the petition does not propose a "law" as required by art. 48, The Initiative, II, § 1, insofar as it proposes to rescind the board's July vote, a vote that had no operative effect because final board approval of the common core standards did not occur until the December vote; and (3) it does not include the requisite enacting language prescribed by G. L. c. 4, § 3.

2. Discussion.[12] a. Standard of review. A challenge to the decision by the Attorney General to certify an initiative petition is reviewed de novo. See Abdow v. Attorney Gen., 468 Mass. 478, 487 (2014). See also Opinion of the Justices, 262 Mass. 603, 606 (1928) ("The certificate of the Attorney General

court to approve the Attorney General's certification of some sections of Initiative Petition 15-12 while disapproving others.

[12] In Bogertman v. Attorney Gen., 474 Mass. 607, 610-612 (2016), we summarized the process and standards for enactment of a measure by popular initiative petition and the duty of the Attorney General under art. 48, The Initiative, II, § 3, to review and certify that the petition meets the criteria set forth in art. 48, The Initiative, II, §§ 1-2. There is no need to repeat the discussion in this case, but it provides the necessary framework for our consideration of the plaintiffs' challenges to the initiative petition before us here.

concerns merely matters of form. . . . Whatever fails to possess elements indispensable for enactment or for submission to the people cannot be made into a 'law' by such certificate"). In conducting our review, we bear in mind "the firmly established principle that art. 48 is to be construed to support the people's prerogative to initiate and adopt laws." Carney v. Attorney Gen., 451 Mass. 803, 814 (2008) (Carney II), quoting Yankee Atomic Elec. Co. v. Secretary of the Commonwealth, 403 Mass. 203, 211 (1988).

b. Relatedness. Pursuant to art. 48, The Initiative, II, § 3, the Attorney General may only certify petitions that contain subjects "which are related or which are mutually dependent" (related subjects requirement). The plaintiffs argue that the petition does not comply with this requirement. We agree. In Carney v. Attorney Gen., 447 Mass. 218, 225-232 (2006) (Carney I), the court, informed by review of the proceedings of the State Constitutional Convention of 1917-1918, summarized the purpose of the related subjects requirement. We stated:

> "The relatedness limitation requires the Attorney General to scrutinize the aggregation of laws proposed in the initiative petition for its impact at the polls. At some high level of abstraction, any two laws may be said to share a 'common purpose.' The salient inquiry is: Do the similarities of an initiative's provisions dominate what each segment provides separately so that the petition is sufficiently coherent to be voted on 'yes' or 'no' by the voters?

      ". . .

      "The language, structure, and history of art. 48 all suggest that any initiative presenting multiple subjects may not operate to deprive the people of a 'meaningful way' to express their will. . . .  It is not enough that the provisions in an initiative petition all 'relate' to some same broad topic at some conceivable level of abstraction. . . .  To clear the relatedness hurdle, the initiative petition must express an <u>operational relatedness among its substantive parts that would permit a reasonable voter to affirm or reject the entire petition as a unified statement of public policy</u>.  A broader interpretation of the common purpose requirement would undercut the very foundations of the relatedness limitation."  (Emphases added; citations omitted.)

<u>Id</u>. at 226, 230-231.  See <u>Abdow</u>, 468 Mass. at 499.[13]  See also

<u>Albano</u> v. <u>Attorney Gen</u>., 437 Mass. 156, 161 (2002); <u>Mazzone</u> v.

---

      [13] <u>Abdow</u> v. <u>Attorney Gen</u>., 468 Mass. 478, 499 (2014), also discusses the related subjects requirement.  We stated:

      "The decisions of this court illustrate how we have endeavored to construe the related subjects requirement in a balanced manner that fairly accommodates both the interests of initiative petitioners and the interests of those who would ultimately vote on the petition.  On the one hand, the requirement must not be construed so narrowly as to frustrate the ability of voters to use the popular initiative as 'the people's process' to bring important matters of concern directly to the electorate; the delegates to the constitutional convention that approved art. 48 did, after all, permit more than one subject to be included in a petition, and we ought not be so restrictive in the definition of relatedness that we effectively eliminate that possibility and confine each petition to a single subject. . . .  On the other hand, relatedness cannot be defined so broadly that it allows the inclusion in a single petition of two or more subjects that have only a marginal relationship to one another, which might confuse or mislead voters, or which could place them in the untenable position of casting a single vote on two or more dissimilar subjects."

Attorney Gen., 432 Mass. 515, 528-529 (2000); Massachusetts

Teachers Ass'n v. Secretary of the Commonwealth, 384 Mass. 209,

219-220 (1981); Opinion of the Justices, 309 Mass. 555, 560-561

(1941).

These cases indicate that at the core of the related

subjects requirement is the condition that the initiative

petition's provisions share a "common purpose," see

Massachusetts Teachers Ass'n, 384 Mass. at 219-220;[14] put

slightly differently but making the same point, the petition's

provisions, considered together, must present a "unified

statement of public policy" that the voters can accept or reject

as a whole. See Carney I, 447 Mass. at 231.

---

Id.

[14] See also Abdow, 468 Mass. at 501-504 (common purpose found where petition's provisions all related to limiting scope of permissible gambling in Commonwealth); Albano v. Attorney Gen., 437 Mass. 156, 161-162 (2002) (common purpose found where constitutional amendment banning same-sex marriage would result in uniform application to several different statutes); Mazzone v. Attorney Gen., 432 Mass. 515, 528-529 (2000) (common purpose found where "provisions of the petition relate directly or indirectly to expanding the scope of the Commonwealth's drug treatment programs and . . . 'fairly' funding those programs"); Massachusetts Teachers Ass'n v. Secretary of the Commonwealth, 384 Mass. 209, 218-221 (1981) (related subjects requirement met where provisions of petition all related directly or indirectly to limitation of taxes); Opinion of the Justices, 309 Mass. 555, 560-561 (1941) (where general subject of proposed law was prevention of pregnancy or conception, provisions seeking to provide for "treatment or prescription given to married person," "teaching in chartered medical schools," and "publication or sale of medical treatises or journals" deemed related as sharing common purpose).

In two cases, we have concluded that the provisions contained in a particular initiative petition do not share a common purpose or reflect a uniform statement of public policy, and, therefore, did not satisfy the related subjects requirement. In Opinion of the Justices, 422 Mass. 1212, 1213, 1220-1221 (1996), in response to questions propounded by the House of Representatives, we considered an initiative petition that included several provisions designed to reduce and limit compensation paid to Massachusetts legislators and also one that would permit the Inspector General to access the records of the General Court and records kept by the commissioner of veterans' services. One of the questions posed to the court was whether the provision relating to the records of the commissioner of veterans' services was sufficiently related to a subject to which the initiative petition's other provisions also related. The petition's drafters asserted that the common purpose among the provisions was "to make Massachusetts government more accountable to the people"; counsel to the House of Representatives proposed that the common purpose might be legislative accountability. Id. at 1220. We determined that the common purpose asserted by the drafters was "unacceptably broad," given that "[o]ne could imagine a multitude of diverse subjects all of which would 'relate' to making government more accountable to the people." Id. at 1221. We accepted the

alternative proposed purpose of legislative accountability as reflecting a common purpose that also was consistent with the title of the initiative petition at issue, but concluded that "[p]ermitting the Inspector General access to the records of the commissioner of veterans' services does not relate in any meaningful way to improving legislative accountability." Id. Accordingly, because these provisions were not "related or mutually dependent," the initiative petition did not satisfy the related subjects requirement. Id.

In the second case, Carney I, the petition proposed to (1) amend certain criminal statutes to punish those who abused or neglected dogs, and (2) ban parimutuel dog racing. Carney I, 447 Mass. at 219-220 & n.7. We rejected as too broad the Attorney General's argument that these were sufficiently related subjects based on a mutual connection to the goal of promoting more humane treatment of dogs, see id. at 224, and concluded that these provisions lacked a sufficient "operational relationship" between them to permit a reasoned vote on a uniform public policy question. See id. at 231-232. In that regard, we observed:

> "The voter who favors increasing criminal penalties for animal abuse should be permitted to register that clear preference without also being required to favor eliminating parimutuel dog racing. Conversely, the voter who thinks that the criminal penalties for animal abuse statutes are strong enough should not be required to vote in favor of

> extending the reach of our criminal laws because he favors abolishing parimutuel dog racing."

Id. at 231.  As a result, the related subjects requirement was not satisfied and the Attorney General's certification of the petition did not comply with art. 48.  Id. at 231-232.

With this background in mind, we turn to Initiative Petition 15-12.  Sections 1 through 3 may be said to share a common purpose:  redefining the contents of the academic standards and curriculum frameworks for the Commonwealth's public schools.  Section 4, however, which would amend § 1I to require annual publication of all the previous year's questions, constructed responses, and essays for each grade and core subject included in the mandatory diagnostic assessment tests, has the explicitly stated purpose of better informing educators about the assessment tests.  Thus, the apparent goal of section 4 is to make more transparent the standardized diagnostic assessment tests and testing process required to be used in public education, and it is a goal that comes with a significant price tag:  as the Attorney General agreed in oral argument before this court, implementing section 4 will require the development and creation of a completely new comprehensive diagnostic test every year, which means a substantial increase in annual expense for the board -- an expense to be borne by

taxpayers and to be weighed by voters in determining whether increased transparency is worth the cost.[15]

An initiative petition properly may contain only subjects "which are related or which are mutually dependent."  Art. 48, The Initiative, II, § 3.  The two subjects in this petition are clearly not "mutually dependent."  In fact, the opposite seems true.  That is, whether the diagnostic assessment tests are based on the common core standards or some previous set of academic standards -- the focus of sections 1 through 3 of the petition -- will not affect in any way the commissioner's obligation under section 4 to release before the start of every school year all of the previous year's test items in order to inform educators about the testing process; the commissioner's obligation will exist independently of the specific curriculum content on which the tests are based.

---

[15] The diagnostic assessment tests currently are embodied not only in the MCAS tests, see note 10, supra, but also in the Partnership for Assessment of Readiness for College and Careers (PARCC) assessment tests currently administered as diagnostic assessments in some Massachusetts school districts.  See Massachusetts Department of Elementary and Secondary Education, Partnership for Assessment of Readiness for College and Careers, http://www.doe.mass.edu/parcc/ [https://perma.cc/56H8-X85Y]. The record does not contain any information concerning whether there are legal constraints that would limit the commissioner's ability to publish information about the PARCC assessment tests, given that these tests are created and published by an entity that is independent of the board and the Department of Elementary and Secondary Education.  See http://www.parcconline. org/about/parcc-inc [https://perma.cc/Q83Y-T6ZY].

Nor do the two subjects have sufficient operational connection, see Carney I, 447 Mass. at 230-231, to be "related" within the meaning of art. 48.  The Attorney General argues that sections 1 through 3 are "operationally related" to section 4 in that all four sections serve a common purpose of imposing "new procedural requirements on the development and implementation of educational standards," and because "the twin educational facets of curriculum and assessment are inextricably coupled: assessments exist to measure the extent to which students are learning and schools are teaching the material, concepts, and strategies set forth in the academic standards."  We agree that at a conceptual level, curriculum content and assessment are interconnected, but the related subjects requirement is not satisfied by a conceptual or abstract bond.  See Carney I, supra at 230-231.  At the operational level, this petition joins a proposed policy of rejecting a particular set of curriculum standards, common core, with a proposed policy of increasing transparency in the standardized testing process at what is likely to be a greatly increased cost, regardless of the content of the curriculum standards used.  These are two separate public policy issues.

There is significant public debate in Massachusetts and the nation about the value of the common core standards; there is also a great deal of debate about the value of standardized

testing.[16]  That both may be controversial public issues in the domain of elementary and secondary education, however, does not, by itself, bring them within the related subjects requirement of art. 48, The Initiative, II, § 3.  The combination of these two issues in one initiative petition does not offer the voters a "unified statement of public policy" (emphasis added).  See Carney I, 447 Mass. at 231.  In other words, we cannot say that "the similarities of [the petition's] provisions dominate what each [provision] provides separately" so that the petition, considered as a whole, "is sufficiently coherent to be voted on 'yes' or 'no' by the voters."  Id. at 226.  Rather, because the issues combined in the petition are substantively distinct, it is more likely that voters would be in the "untenable position of casting a single vote on two or more dissimilar subjects," Abdow, 468 Mass. at 499, which is the specific misuse of the initiative process that the related subjects requirement was intended to avoid.  See Carney I, supra at 229-231.

Our conclusion that Initiative Petition 15-12 fails to satisfy the related subjects requirement of art. 48 will prevent the proposed measure in the petition from being placed on the 2016 Statewide ballot.  Because this is so, we need not consider the plaintiffs' additional claims that the petition fails to

---

[16] See If the MCAS Is So Good, Why Are We Ditching It?, Boston Globe Magazine, June 12, 2016; Leaked Questions Rekindle Debate Over Common Core Tests, N.Y. Times, May 24, 2016.

propose a "law," see art. 48, The Initiative, II, § 1, and that the necessary enacting language required by G. L. c. 4, § 3, is absent.

3. Conclusion. We remand the case to the county court for entry of a judgment declaring that the Attorney General's certification of Initiative Petition 15-12 is not in compliance with the limitations of art. 48 and enjoining the Secretary from taking steps to place the measure on the ballot in the 2016 Statewide election.

So ordered.

<u>Appendix</u>.

<u>Initiative Petition for a Law Relative to Ending Common Core
Education Standards</u>

"<u>Be it enacted by the people and their authority</u>:

"SECTION 1.  Notwithstanding the provisions of any general or
special law to the contrary, the vote taken by the Massachusetts
Board of Elementary and Secondary Education on July 21, 2010, to
adopt the Common Core State Standards for Mathematics and
English Language Arts is hereby rescinded.  The curriculum
frameworks in Mathematics and English Language Arts that were in
effect prior to that date are hereby restored.

"SECTION 2.  Section 1D of Chapter 69 is hereby amended in the
second paragraph by inserting after the first sentence, the
following new sentences:

> The process shall include committees made up exclusively of
> public school teachers and academics from private and
> public colleges and universities established and operated
> in Massachusetts.  The commissioner shall copyright the
> frameworks, which shall be wholly owned by the department;
> permission shall be granted to copy any or all parts of
> these frameworks for non-commercial educational purposes.

"SECTION 3.  Said section 1D of chapter 69 is hereby further
amended in the second paragraph by inserting after the third
sentence the following new sentences:

> There shall be three review committees, one for each
> discipline of math, science and technology and English.
> Each review committee shall have three members appointed by
> the governor who shall choose said members from private or
> public research universities established and operated in
> Massachusetts for each of the disciplines.  For the
> purposes of this section, a 'research university' is any
> university that awards doctoral degrees in the arts and
> sciences.  Each review committee shall warrant by a two-
> thirds vote that the frameworks are equivalent to the
> standards of the most educationally advanced nations as
> determined by the Trends in Mathematics and Sciences Study.

No framework shall be approved by the board without such a warrant.

"SECTION 4.  Section 1I of Chapter 69 is hereby amended in the third paragraph by inserting after the second sentence, the following new sentence:

In order to better inform the teachers and administrators about the diagnostic assessments, after the administration of the assessments but before the start of the new school year, the commissioner shall release all of the test items, including questions, constructed responses and essays, for each grade and every subject.

"SECTION 5.  The several provisions of this Act are independent and severable and the invalidity, if any, of any part or feature thereof shall not affect or render the remainder of the Act invalid or inoperative.

"SECTION 6.  This act shall take effect immediately upon becoming law."