NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-12472
SJC-12473

 AMANDA S. OBERLIES & others[1]  vs.  ATTORNEY GENERAL & another.[2]

DONNA KELLY WILLIAMS & others[3]  vs.  ATTORNEY GENERAL & another.[4]


         Suffolk.     April 3, 2018. - June 18, 2018.

      Present:  Gants, C.J., Lenk, Gaziano, Lowy, Budd, Cypher,
                      & Kafker, JJ.


Initiative.  Constitutional Law, Initiative petition.  Attorney
     General.  Nurse.



     Civil action commenced in the Supreme Judicial Court for
the county of Suffolk on January 19, 2018.

     The case was reported by Gaziano, J.

     Civil action commenced in the Supreme Judicial Court for
the county of Suffolk on September 8, 2017.

---

     [1] Sharon Gale, Patricia M. Noga, and Timothy Quigley.

     [2] Secretary of the Commonwealth.

     [3] Karen A. Coughlin, Susan Wright Thomas, Mary Elizabeth
Amsler, Daniel R. Rec, Nora A. Watts, Linda Barton, Ellen Smith,
Paula Ryan, and Harley W. Keisch.

     [4] Secretary of the Commonwealth.

The case was reported by Gaziano, J.

Edward V. Colbert, III (David Koha & Carmen F. Francella, III, also present) for Donna Kelly Williams & others.

Juliana deHaan Rice, Assistant Attorney General (Michael B. MacKenzie, Assistant Attorney General, also present) for the Attorney General.

Andrew N. Nathanson (Elissa Flynn-Poppey & Mathilda McGee-Tubb also present) for Amanda S. Oberlies & others.

The following submitted briefs for amici curiae:

Thaddeus A. Heuer, Andrew M. London, & Rachel C. Hutchinson for Steward Health Care System LLC.

Edward V. Colbert, III, David Koha, & Carmen F. Francella, III, for Massachusetts Nurses Association.

Carol Igoe, of California, & David Hadas for National Nurses United & another.

Thomas R. Kiley, Carol Valvo, & Meredith Fierro for American Nurses Association Massachusetts, Inc.

Elissa Flynn-Poppey, Andrew N. Nathanson, & Mathilda S. McGee-Tubb for Massachusetts Health & Hospital Association & others.

LENK, J.  We are asked to determine whether two initiative petitions satisfy the requirements of art. 48 of the Amendments to the Massachusetts Constitution.  The first, Initiative Petition 17-07, would limit the number of patients who may be assigned to a registered nurse in Massachusetts health care facilities, and would prohibit facilities from accommodating those limits by reducing certain other health care staff.  The second, Initiative Petition 17-08, contains the same provisions as the first petition, with an additional section that would require publicly funded hospitals to make annual public disclosures of their financial assets.  The Attorney General certified that Initiative Petition 17-07 meets the requirements

of art. 48, but declined to certify Initiative Petition 17-08, after concluding that the mandate for financial disclosure was not sufficiently related to or mutually dependent upon the other provisions in the petition. The opponents of Initiative Petition 17-07, and the proponents of Initiative Petition 17-08, sought relief before a single justice in the county court.

On the request of all parties, the single justice reserved and reported both cases to this court. In the first case, the plaintiffs challenge the Attorney General's decision to certify Initiative Petition 17-07; they contend that the nurse-to-patient ratios are not sufficiently related to or dependent upon the requirement that, in implementing those ratios, covered facilities are prohibited from reductions in other health care staff. Because the restriction on staff reduction pertains to implementation of the nurse-to-patient ratios, we conclude that these two elements of the proposal form "a unified statement of public policy," Carney v. Attorney Gen., 447 Mass. 218, 231 (2006) (Carney I), and therefore are related "within the meaning of art. 48." See Hensley v. Attorney Gen., 474 Mass. 651, 672 (2016). The plaintiffs challenging Initiative Petition 17-07 also argue that it is not in the form required by art. 48 for presentation to the voters, on a number of grounds, which we determine are unsupported. As a result, we conclude that the

Attorney General's decision to certify Initiative Petition 17-07 was correct.

In the second case, the plaintiffs challenge the Attorney General's decision not to certify Initiative Petition 17-08; they argue that the financial disclosure provision is sufficiently related to the nurse-to-patient ratios, because it will shed light on facilities' capacity to meet new staffing needs. We conclude that the Attorney General was correct in declining to certify Initiative Petition 17-08 on the ground that the financial asset disclosure requirement and the limitations on nurse-patient staffing ratios are not sufficiently related or mutually dependent, as required by art. 48. See Massachusetts Teachers Ass'n v. Secretary of the Commonwealth, 384 Mass. 209, 219-220 (1981).[5]

1. Background. In August, 2017, two petitions, each signed by ten registered voters in the Commonwealth, were submitted to the Attorney General for certification. The Attorney General numbered them Initiative Petition 17-07 and

---

[5] We acknowledge the amicus briefs submitted by the Massachusetts Nurses Association, Steward Health Care System LLC, and National Nurses United and the California Nurses Association in Oberlies's case. We also acknowledge the amicus briefs submitted by the Massachusetts Health & Hospital Association, Massachusetts Council of Community Hospitals, Conference of Boston Teaching Hospitals, and Massachusetts Association of Behavioral Health Systems; Steward Health Care System LLC; and the American Nurses Association Massachusetts, Inc., in Williams's case.

Initiative Petition 17-08.  Although both are entitled "Initiative Petition For A Law Relative To Patient Safety And Hospital Transparency," the petitions differ with respect to one section.

Initiative Petition 17-07 seeks to create a new statute, entitled "The Patient Safety Act" (act or proposed act) that would amend c. 111 of the General Laws.  The act would create "patient assignment limits" for registered nurses working in "facilities" in Massachusetts.  The proposed act defines the term "[f]acility" as "a hospital licensed under [G. L. c. 111, § 51], the teaching hospital of the University of Massachusetts medical school, any licensed private or [S]tate-owned and [S]tate-operated general acute care hospital, an acute psychiatric hospital, an acute care specialty hospital, or any acute care unit within a [S]tate[-]operated healthcare facility."  "[R]ehabilitation facilities" and "long-term care facilities" are explicitly excluded.

The act proposed by Initiative Petition 17-07 would set limits on the number of patients who could be assigned to a registered nurse in any given facility, based on the unit where the nurse works and the condition of the patients.  For example, in any emergency services department, a registered nurse would be assigned only one critical care or intensive care patient; in pediatric units, up to four pediatric patients could be assigned

to one registered nurse.  In any unit not specifically listed in the proposed act, the patient assignment ratio would be four patients per registered nurse.  The patient assignment limits would be in effect at all times except "during a [S]tate or nationally declared public health emergency."

The proposed act provides, "Each facility shall implement the patient assignment limits established by [G. L. c. 111, §] 231C [the nurse-patient limit provision of the proposed act]. However, implementation of these limits shall not result in a reduction in the staffing levels of the health care workforce." We refer to this requirement as the "workforce reduction restriction."  The "health care workforce" is defined by the proposed act as all "personnel employed by or contracted to work at a facility that have an effect upon the delivery of quality care to patients, including but not limited to registered nurses, licensed practical nurses, unlicensed assistive personnel, service, maintenance, clerical, professional and technical workers, and all other health care workers."  The proposed act would require each facility to submit a written plan to the Health Policy Commission (HPC),[6] certifying that the

_____

[6] The Health Policy Commission was created in 2012 to "monitor the reform of the health care delivery and payment system in the [C]ommonwealth."  See St. 2012, c. 224, § 15; G. L. c. 6D, §§ 2, 5.

facility will implement the patient assignment limits without diminishing its health care workforce.

The act proposed by Initiative Petition 17-07 also would authorize the HPC to promulgate regulations governing implementation and operation of the act.  These regulations would include, but not be limited to, "regulations setting forth the contents and implementation of:  (a) certification plans each facility must prepare for implementing the patient assignment limits enumerated in [§] 231C, including the facility obligation that implementation of limits shall not result in a reduction in the staffing level of the health care workforce assigned to such patients; and (b) written compliance plans that shall be required for each facility out of compliance with the patient assignment limits."  The HPC would not be authorized to promulgate any regulation that directly or indirectly delays, waives, or modifies the patient assignment limits, or the requirement that those limits be implemented without resulting reductions in a facility's health care workforce.

Under the terms of the proposed act, the HPC "may conduct inspections of facilities to ensure compliance with the terms of this act.  A facility's failure to adhere to the patient assignment limits," as adjusted per the act's requirements, "shall be reported by the [HPC] to the Attorney General for enforcement."  The Attorney General would be able to sue a

facility found to be in violation of the act in the Superior Court for injunctive relief and civil penalties up to $25,000 per violation.

The other initiative petition at issue in this case, Initiative Petition 17-08, seeks to enact the "Patient Safety and Hospital Transparency Act." Initiative Petition 17-08 is essentially identical to Initiative Petition 17-07, but with one additional provision. General Laws c. 111, § 231K, would require that "[e]ach facility that accepts funds from the Commonwealth . . . report annually to the [HPC] all financial assets owned by the facility, along with assets of any holding company and any and all parent, subsidiary, or affiliated companies." Under Initiative Petition 17-08, the HPC would be required to make this information public within seven days of its receipt, unless doing so otherwise is prohibited by law.

In September, 2017, the Attorney General certified that Initiative Petition 17-07 is in proper form for submission to the people; that it is not substantially the same as any measure qualified for submission to the people at either of the two preceding biennial State elections; and that it contains only matters that are related or mutually dependent and not excluded from the initiative process under art. 48. By December 6, 2017, the petition's proponents had gathered and filed sufficient voter signatures to require the Secretary of the Commonwealth

(Secretary) to transmit the petition to the Legislature.  The Secretary did so in January, 2018.  If the Legislature does not adopt the measure, and if the proponents submit sufficient additional signatures by July 3, 2018, the Secretary intends to include the proposed law in the Information for Voters guide that will be printed in the summer of 2018.  See art. 48, The Initiative, V, § 1, of the Amendments to the Massachusetts Constitution, as amended by art. 81, § 2, of the Amendments.

In January, 2018, four registered voters commenced an action in the county court, challenging the Attorney General's decision to certify Initiative Petition 17-07.  These plaintiffs, whom we will call the Oberlies plaintiffs, sought writs of mandamus and certiorari and a declaratory judgment, and asked the court to declare that Initiative Petition 17-07 is invalid, to quash the Attorney General's certification of the petition, and to enjoin the Secretary of the Commonwealth from placing the petition on the 2018 Statewide ballot.  On the parties' joint motion and an agreed-upon statement of facts, the single justice reserved and reported the case to the full court.

At the same time that she certified Initiative Petition 17-07, the Attorney General declined to certify Initiative Petition 17-08, after having concluded that the financial disclosure requirement was not sufficiently related to or mutually dependent upon the patient assignment limits to satisfy the

requirements of art. 48.  Shortly thereafter, ten registered voters filed a complaint in the county court, seeking an order of mandamus reversing that decision.[7]  We refer to these plaintiffs as the Williams plaintiffs.

The single justice allowed the parties' joint motion to enter a preliminary order that, without passing on the likelihood that the Williams plaintiffs would succeed, required the Attorney General to release a summary of the petition to the Secretary of the Commonwealth.  This order also directed the Secretary to prepare blank signature forms so that signatures could be gathered while the challenge to the Attorney General's decision was pending.  In December, 2017, upon the joint request of the parties, the order was amended to require the Secretary to advance the petition to the Legislature, if the proponents collected sufficient signatures prior to December 6, 2017.  Also that month, on the parties' joint motion and an agreed statement of facts, the single justice reserved and reported the case to the full court.

2.  Discussion.  When a new law is proposed by initiative petition, before it can be presented to the Legislature and then to the voters for their consideration, the Attorney General must

---

[7] The original Williams plaintiffs moved, with the assent of the defendants, to substitute ten different registered voters as the Williams plaintiffs.  The single justice allowed this motion.

review it and certify that it meets the requirements of art. 48. See art. 48, The Initiative, II, § 3, as amended by art. 74. We review the Attorney General's decision regarding whether to certify a ballot petition de novo, bearing in mind "the firmly established principle that art. 48 is to be construed to support the people's prerogative to initiate and adopt laws." Abdow v. Attorney Gen., 468 Mass. 478, 487 (2014), quoting Carney v. Attorney Gen., 451 Mass. 803, 814 (2008).

The primary question at issue with respect to both Initiative Petitions 17-07 and 17-08 is whether the subjects addressed in each petition are related or mutually dependent. See art. 48, The Initiative, II, § 3, as amended by art. 74. The opposition to Initiative Petition 17-07 also raises an additional question whether it is in a proper form for submission to the voters as required by art. 48. See Nigro v. Attorney Gen., 402 Mass. 438, 443 (1988). We address each issue in turn.

a. Whether subjects are related or mutually dependent. Under art. 48, if a petition addresses multiple subjects, those subjects must be "related or . . . mutually dependent." Art. 48, The Initiative, II, § 3, as amended by art. 74. See Albano v. Attorney Gen., 437 Mass. 156, 161 (2002). We have held that two provisions that "exist independently" of each other are not mutually dependent. See Gray v. Attorney Gen.,

474 Mass. 638, 648 (2016). No "bright-line" test exists for determining whether two subjects are related. See Dunn v. Attorney Gen., 474 Mass. 675, 680 (2016); Abdow, 468 Mass. at 499. "The decisions of this court illustrate how we have endeavored to construe the related subjects requirement in a balanced manner that fairly accommodates both the interests of initiative petitioners and the interests of those who would ultimately vote on the petition. On the one hand, the requirement must not be construed so narrowly as to frustrate the ability of voters to use the popular initiative as 'the people's process' to bring important matters of concern directly to the electorate." Abdow, supra. On the other hand, while art. 48 does not demand that an initiative concern only one subject, "relatedness cannot be defined so broadly that it allows the inclusion in a single petition of two or more subjects that have only a marginal relationship to one another." Id. Otherwise, a petition "might confuse or mislead voters, or . . . place them in the untenable position of casting a single vote on two or more dissimilar subjects." Id.

Indeed, the drafters of art. 48 were concerned that initiatives could confuse voters, or could be used for "logrolling." See Dunn, 474 Mass. at 679-680; Carney I, 447 Mass. at 226-228. "Logrolling" refers to the bundling of multiple provisions such that they all gain approval, even if

one or more of them would, standing alone, be rejected. Carney I, supra at 219 n.4. Logrolling is of particular concern when an unpopular provision could be hidden or made less apparent by a more attractive proposal that catches voters' attention. See id. at 229.

We accordingly have held that the related subjects requirement is satisfied where "one can identify a common purpose to which each subject of an initiative petition can reasonably be said to be germane." Massachusetts Teachers Ass'n, 384 Mass. at 219-220. "We have not construed this requirement narrowly nor demanded that popular initiatives be drafted with strict internal consistency." Mazzone v. Attorney Gen., 432 Mass. 515, 528-529 (2000). "But we have also cautioned that '[a]t some high level of abstraction, any two laws may be said to share a "common purpose."'" Dunn, 474 Mass. at 680, quoting Abdow, 468 Mass. at 500.

"[W]e have posed two questions to be considered in addressing the related subjects requirement." Dunn, 474 Mass. at 680. First, "[d]o the similarities of an initiative's provisions dominate what each segment provides separately so that the petition is sufficiently coherent to be voted on 'yes' or 'no' by the voters?" Abdow, 468 Mass. at 500, quoting Carney I, 447 Mass. at 226. Second, does the initiative petition "express an operational relatedness among its

substantive parts that would permit a reasonable voter to affirm or reject the entire petition as a unified statement of public policy?"  Abdow, supra at 501, quoting Carney I, supra at 230-231.

The Oberlies plaintiffs challenge the Attorney General's determination that Initiative Petition 17-07 contains subjects that are related or mutually dependent.  The Williams plaintiffs assert that the Attorney General erred in determining that Initiative Petition 17-08 fails this test.  For the reasons discussed infra, we conclude that the Attorney General was correct in reaching both of these determinations.

i.  Initiative Petition 17-07.  The common purpose of the provisions in Initiative Petition 17-07 is to establish and enforce nurse-to-patient ratios in facilities in the Commonwealth.[8]  This common purpose is not "so broad as to render the 'related subjects' limitation meaningless."  Massachusetts Teachers Ass'n, 384 Mass. at 219.  The patient assignment limits

_____

[8] The Oberlies plaintiffs contend that Initiative Petition 17-07's purpose is "patient safety," based on the title of the proposed act, references to patient safety in the petition's text, and a memorandum submitted by its proponents to the Attorney General.  The court agrees with the Attorney General's characterization of the proposal's purpose, which is to achieve patient safety specifically through the "establishment of patient-to-nurse assignment limits in hospitals and other specified health care facilities."  See Opinion of the Justices, 422 Mass. 1212, 1220-1221 (1996) (rejecting initiative drafters' asserted purpose, and accepting purpose advanced by brief of counsel to House of Representatives).

"can reasonably be said to be germane" to the petition's common purpose, because they implement the nurse-to-patient ratios that the petition seeks to achieve.  Id. at 219-220.  Notwithstanding the Oberlies plaintiffs' claims to the contrary, the workforce reduction restriction also advances the petition's common purpose.

First, "the similarities of [the] initiative's provisions dominate what each segment provides separately so that the petition is sufficiently coherent to be voted on 'yes' or 'no' by the voters."  Abdow, 468 Mass. at 500, quoting Carney I, 447 Mass. at 226.  The workforce reduction restriction only prohibits reduction in a facility's health care workforce that results from putting in place the patient assignment limits.[9]  In other words, the restriction on workforce reduction is triggered by the implementation of these limits.  It does not prohibit reduction of the health care workforce for any other reason, but, rather, dictates how nurse-to-patient ratios may be maintained:  in a manner such that there be no reductions in staff among other members of the health care workforce.  Because the patient assignment limits and the workforce reduction

_____

[9] Initiative Petition 17-07 provides, "Each facility shall implement the patient assignment limits established by [G. L. c. 111, §] 231C [the nurse-patient limit provision of the proposed act].  However, implementation of these limits shall not result in a reduction in the staffing levels of the health care workforce."

restriction both determine how nurse-patient staffing ratios will be implemented, their similarity "dominate[s] what each segment provides separately."  See Abdow, supra, quoting Carney I, supra.

Second, Initiative Petition 17-07 "express[es] an operational relatedness among its substantive parts that would permit a reasonable voter to affirm or reject the entire petition as a unified statement of public policy."  Abdow, 468 Mass. at 501, quoting Carney I, 447 Mass. at 230-231.  Because it anticipates and addresses a potential consequence of the nurse-patient staffing ratios, the workforce reduction restriction is "simply one piece of the proposed integrated scheme."  See Hensley, 474 Mass. at 659.  If hospitals were economically burdened by hiring more registered nurses, they might attempt to compensate by reducing the numbers of other staff.  Indeed, when California implemented nurse-to-patient ratios, the health care industry protested that hospitals would be forced to lay off personnel to pay for additional nurses.  See California Nurses Ass'n vs. Schwarzenegger, Cal. Super Ct., No.04CS01725, slip op. (Sacramento County May 27, 2005).  "Neither the Attorney General nor this court is required to check common sense at the door when assessing the question of relatedness."  Carney I, 447 Mass. at 232.  Because the workforce reduction restriction would shape the impact of the

patient assignment limits, it forms part of the proposal's "unified statement of public policy."  See id. at 230-231.

In this sense, the situation at bar is similar to that in Dunn.  In that case, we considered a petition seeking to prohibit confinement of specified farm animals in a cruel manner (farm provision), and also banned the sale, within the Commonwealth, of certain products produced from animals so confined (sales provision).  Dunn, 474 Mass. at 676.  We concluded that the provisions were related within the meaning of art. 48, because the sales provision "protects Massachusetts farmers who comply with the law by preventing Massachusetts businesses from selling eggs, veal, and pork obtained from out-of-State farmers who confine their animals in a cruel manner and who, by doing so, may be able to underprice their Massachusetts competitors."  Id. at 681, 682.  In other words, the sales provision anticipated and mitigated private actors' foreseeable reactions to the farm provision.

Similarly, here, the workforce reduction restriction seeks to address facilities' potential responses to the nurse-patient staffing ratio requirement.  Indeed, because the workforce reduction restriction regulates the same facilities as those affected by the patient assignment limits, the two requirements are more closely related than the farm provision and the sales provision we considered in Dunn, supra; the farm provision

governed farms that produced certain goods, while the sales provision constrained businesses that purchased those goods. Id. at 676.

"The 'unified statement of public policy' called for by Carney I, 447 Mass. at 230-231, does not require that an initiative petition be a comprehensive piece of legislation that would entirely cover its field. It requires that the portion of the field covered by the petition be presented in a way that permits a reasonable voter to make an intelligent up or down choice." Abdow, 468 Mass. at 503. A voter who approves of the registered nurse-patient staffing ratio requirement, but believes health care facilities should be able to accommodate this requirement by eliminating other members of the health care workforce, "is free to vote 'no' . . . , but the proposed act does not place anyone 'in the untenable position of casting a single vote on two or more dissimilar subjects'" (emphasis in original). Hensley, 474 Mass. at 659, quoting Abdow, supra at 499.

The argument that Initiative Petition 17-07 violates the related subjects requirement because it might impose a financial burden on facilities is unavailing. The Oberlies plaintiffs point to Gray, 474 Mass. at 647, where, in concluding that the proposal did not satisfy the relatedness test, we noted the costs associated with one of the initiative's provisions. That

case concerned a proposal that would have altered the educational curriculum of publicly funded elementary and secondary schools, and would have required the release of certain test information included in the prior year's comprehensive assessment tests mandated for those schools. See id. at 638-639, 648. We concluded that those two subjects were not sufficiently related, because educational curricula and school transparency represented "two separate public policy issues." Id. at 649. Although we observed that there could be a high "price tag" associated with the "test items" disclosure requirement, this observation was not dispositive of our conclusion. See id. at 647-649. The Oberlies plaintiffs' reliance on Gray is misplaced.

The Oberlies plaintiffs also suggest that the workforce reduction restriction is simply an attempt to make Initiative Petition 17-07 more politically palatable, by providing job security to health care workers. The proposed act, however, would prohibit only health care workforce reductions resulting from the implementation of nurse-patient assignment limits; it is not an outright ban on reducing staffing levels at covered facilities. Even if Initiative Petition 17-07 might be appealing to some hospital employees because they believed that they would stand to gain job security if it were enacted, the enjoyment, by some, of an "ancillary benefit" does not render

the proposal's provisions unrelated.  See Dunn, 474 Mass. at 682.  "Nor is it necessary that all of an initiative's supporters share the same motivations" in order for the initiative to satisfy the relatedness test.  See Abdow, 468 Mass. at 503.[10]

The Oberlies plaintiffs also contend that voters will not understand the potential impact of the workforce reduction restriction.  Based on their expansive reading of the definition of "health care workforce," the Oberlies plaintiffs maintain that Initiative Petition 17-07 "mandates the retention of virtually every employee or contractor who works for or at a hospital."[11]  They argue that even the petition's proponents do not appreciate the possible sweeping consequences of the workforce reduction restriction.  Additionally, the parties dispute whether a separate section in the petition limits the definition of the "health care workforce," thereby narrowing the

---

[10] Additionally, the Oberlies plaintiffs have not alleged that the electorate previously rejected an initiative proposing solely patient assignment limits, without any associated workforce reduction provision.  Cf. Carney v. Attorney Gen., 447 Mass. 218, 222, 232 (2006) (voters' earlier rejection of one provision of proposed petition was relevant to relatedness analysis).

[11] Initiative Petition 17-07 defines "health care workforce" to include those "personnel employed by or contracted to work at a facility that have an effect upon the delivery of quality care to patients, including but not limited to registered nurses, licensed practical nurses, unlicensed assistive personnel, service, maintenance, clerical, professional and technical workers, and all other health care workers."

scope of the workforce reduction restriction. This section requires that facilities' certification plans, which must be submitted to HPC, address "the facility obligation that implementation of limits shall not result in a reduction of the staffing level of the health care workforce assigned to such patients" (emphasis supplied). The parties disagree with respect to whether, pursuant to this language, only those employees who are assigned to individual patients would be considered part of the health care workforce.

When determining whether an initiative meets the requirements of art. 48, we exercise "restraint in deciding whether a measure would or would not have the legal effect intended," and restrict such considerations to the extent necessary to determine whether a proposal satisfies the requirements of art. 48. See Abdow, 468 Mass. at 507. "In circumstances like these, the proper time for deciding definitively whether the measure has the desired legal effect will come if and when the measure is passed." Id. at 508. We need not, at this juncture, construe the definition of "health care workforce" or decide whether this definition could have consequences that its drafters did not intend. Nor do we need to determine how to reconcile this definition with the proposed act's reference, in a separate section, to "the facility obligation that implementation of limits shall not result in a

reduction in the staffing level of the health care workforce assigned to such patients" (emphasis supplied). The proper interpretation of these provisions is not dispositive of the question of relatedness. Under any reading, the workforce reduction restriction merely constrains how nurse-patient staffing ratios may be implemented. As a result, we conclude that Initiative Petition 17-07 "contains only subjects that are related or are mutually dependent. It is therefore fair to ask the people of the Commonwealth to vote 'yes' or 'no' on" the petition. Dunn, 474 Mass. at 682.

ii. Initiative Petition 17-08. As stated, the text of Initiative Petition 17-08 is virtually identical to that of Initiative Petition 17-07, with the addition of one section. That section, the financial disclosure requirement, would require hospitals that accept funds from the Commonwealth to file annual reports of their financial assets with the HPC. The HPC, in turn, would be required to make this information public within seven calendar days of its receipt, unless doing so is otherwise prohibited by law.

In determining whether the financial disclosure requirement is sufficiently related to the remainder of Initiative Petition 17-08, we look for "a common purpose to which each subject of [the] initiative petition can reasonably be said to be germane." Massachusetts Teachers Ass'n, 384 Mass. at 219-220. The

Williams plaintiffs contend that the common purpose unifying Initiative Petition 17-08 is patient safety. They assert that the financial disclosure requirement furthers this goal by shining a light on hospitals' economic capacity to hire new staff, as might be required by the nurse-patient assignment limits.

These issues might be connected, in some sense, if hospitals' financial assets reflect their ability to pay the salaries of additional registered nurses. The patient assignment limits, however, are mandatory and inflexible, and are not tied to a hospital's financial condition; under the terms of Initiative Petition 17-08, an inability to pay is no defense for a failure to comply. Nor does the proposal provide a mechanism to increase funding to hospitals that would bear an economic hardship if forced to hire additional registered nurses. The financial disclosure requirement, therefore, has "only a marginal relationship" to the nurse-patient staffing ratios. See Abdow, 468 Mass. at 499. Moreover, the initiative cannot be saved by assertion of a more general common purpose, such as regulation of hospitals. "At some high level of abstraction, any two laws may be said to share a 'common purpose,'" Carney I, 447 Mass. at 226, but a petition's asserted common purpose cannot be "so broad as to render the relatedness

limitation 'meaningless,'" id. at 225, quoting Massachusetts Teachers Ass'n, 384 Mass. at 219.

Initiative Petition 17-08 recalls Opinion of the Justices, 422 Mass. 1212, 1220-1221 (1996), in which the Justices concluded that the goal of making "Massachusetts government more accountable to the people" was "unacceptably broad" as a "general purpose" for an initiative petition. The petition at issue in that case primarily sought to regulate legislators' compensation, but contained one provision that would have permitted the Inspector General to request and summon records held by the commissioner of veterans' services. Id. at 1213-1214. The Justices determined that the proposal's true common purpose was more narrow, specifically to improve legislative accountability. Id. at 1220-1221. The initiative failed the related subjects requirement because "permitting the Inspector General access to the records of the commissioner of veterans' services does not relate in any meaningful way to improving legislative accountability." Id. at 1221. Similarly, here, the financial asset disclosure requirement "does not relate in any meaningful way" to patient safety through the establishment of nurse-patient staffing ratios.[12] See id.

_____

[12] The Williams plaintiffs alternatively assert that the common purpose of Initiative Petition 17-08 is "the safety of patients through adequate staffing and hospital transparency in disclosing their means and methods of staffing." By its terms,

The subjects are unrelated because they concern "two separate public policy issues." Gray, 474 Mass. at 649. This becomes clear when one reads the section of Initiative Petition 17-08 that would impose the financial disclosure requirement. That section provides, "It is in the public interest to have access to a transparent, detailed, and comprehensive record of the financial health of each facility that accepts funds from the Commonwealth to provide healthcare to its residents." The stated policy goal of this section -- public access to hospitals' financial records -- has no apparent connection to the petition's purported purpose of ensuring patient safety by virtue of creating nurse-to-patient staffing ratios. "The combination of these two issues in one initiative petition does not offer the voters a 'unified statement of public policy" (emphasis in original). Id. at 649, quoting Carney I, 447 Mass. at 231. "Rather, because the issues combined in the petition are substantively distinct, it is more likely that the voters would be in the 'untenable position of casting a single vote on two or more dissimilar subjects.'" Gray, supra, quoting Abdow, 468 Mass. at 499. These subjects therefore lack "sufficient

---

however, this "common purpose" purports to tackle "two separate public policy issues": adequate hospital staffing and hospital transparency. See Gray v. Attorney Gen., 474 Mass. 638, 649 (2016).

operational connection . . . to be 'related' within the meaning of art. 48." Gray, supra at 648.

As a result, we conclude that Initiative Petition 17-08 fails the two-part relatedness test. First, the similarities between the financial disclosure requirement and the remainder of the initiative petition do not "dominate what each segment provides separately." Carney I, 447 Mass. at 226. While both elements of the proposal pertain to hospitals, even this commonality is limited; the financial disclosure requirement would be imposed only on State-funded hospitals, while the remainder of the initiative would apply to all facilities. Second, and more crucially, because they represent "two separate public policy issues," Gray, 474 Mass. at 649, there is no "operational relatedness" between the two requirements. See Carney I, supra at 230-231.

Additionally, "[t]he two subjects in this petition are clearly not 'mutually dependent.' In fact, the opposite seems true." Gray, 474 Mass. at 648, quoting Art. 48, The Initiative, II, § 3, as amended by art. 74. In Gray, we held that terminating public schools' use of the national common core curriculum was not "mutually dependent" on the requirement that schools release certain testing information because, "whether the diagnostic assessment tests are based on the common core standards or some previous set of academic standards . . . will

not affect in any way the . . . obligation" to release the required test information.  Id.  Because these two subjects would "exist independently," they were not "mutually dependent." Id.  Similarly, here, a facility's implementation of, or failure to implement, the required nurse-to-patient ratios would "not affect in any way" its obligation to disclose its financial assets, and the two requirements would therefore "exist independently."  Id.  The provisions of Initiative Petition 17-08 are thus not "mutually dependent."  See id.

In sum, the nurse-patient staffing ratios and the financial disclosure requirement are neither mutually dependent nor related subjects.  The Attorney General was correct in declining to certify that Initiative Petition 17-08 satisfies the demands of art. 48.

b.  Proper form requirement.  Only laws and constitutional amendments may be presented through the initiative process under art. 48.  See art. 48, The Initiative, I ("the popular initiative" allows specified number of voters "to submit constitutional amendments and laws to the people").  "[A]n initiative petition that proposes neither a law nor a constitutional amendment is not 'in proper form for submission to the people.'"  Dunn, 474 Mass. at 682, quoting art. 48, The Initiative, II, § 3, as amended by art. 74.  Although we have declined to "construe the word 'form' in a narrow and technical

sense," our analysis of whether a petition has the proper form has focused on the question "whether a law is proposed." Paisner v. Attorney Gen., 390 Mass. 593, 598 (1983). In other words, we examine whether the petition presents a measure that has a binding effect, and "govern[s] conduct external to the legislative body." Id. at 600. The Oberlies plaintiffs contend, on five different grounds, that Initiative Petition 17-07 does not take the proper form required by art. 48. For the reasons discussed infra, we conclude that these claims are unavailing.[13]

The Oberlies plaintiffs first argue that the title of Initiative Petition 17-07 -- "Initiative Petition For A Law Relative To Patient Safety And Hospital Transparency" -- is misleading, because, unlike the rejected Initiative Petition 17-08, it contains no provision requiring hospitals to disclose their financial assets. In this view, the title's reference to

---

[13] The Oberlies plaintiffs properly do not contend that Initiative Petition 17-07, if approved, would not constitute a law. We observe that, under Initiative Petition 17-07, "[e]ach facility shall implement the patient assignment limits," and "implementation of these limits shall not result in a reduction in the staffing levels of the health care workforce" (emphasis supplied). It is well established that use of the word "shall" indicates a mandatory duty. See Galenski v. Erving, 471 Mass. 305, 309 (2015), citing Hashimi v. Kalil, 388 Mass. 607, 609 (1983). The proposed act thus would have a "binding" effect on facilities, thereby regulating "conduct external to the legislative body." Paisner v. Attorney Gen., 390 Mass. 593, 600 (1983). The initiative petition therefore meets the requirement of art. 48 that it propose either a law or a constitutional amendment. See id.

"hospital transparency" is "incongruous." The Oberlies plaintiffs further contend that the title should include a reference to the workforce reduction restriction.

"Nowhere is it provided that the title of a proposed law shall be descriptive of it to any particular degree, or wholly accurate so far as it is descriptive." Nigro, 402 Mass. at 445, quoting Bowe v. Secretary of the Commonwealth, 320 Mass. 230, 240-241 (1946). "The legislative history and structure of art. 48 demonstrate that the 'proper form' requirement is not intended to require a title to give fair notice of the scope and essential nature of the underlying measure." Nigro, supra. Rather, the Attorney General's summary serves the purpose of explaining the proposal's contents, and "any harm caused by a misleading title can be corrected by an accurate summary."[14] Id. at 447, citing Opinion of the Justices, 309 Mass. 631, 640-641 (1941). Even if the title were inaccurate, therefore, and we do not conclude that the title here is, that alone would not render the form of an initiative petition invalid.

The Oberlies plaintiffs' remaining challenges to the form of Initiative Petition 17-07 are related to its contents. They contend that the terms "facilities" and "health care workforce," as used in the text, are internally inconsistent or open to

---

[14] The Oberlies plaintiffs have not challenged the Attorney General's summary of Initiative Petition 17-07.

multiple interpretations. They thereby ask us to conduct "an [impermissible] inquiry into substance." See Nigro, 402 Mass. at 445-446 ("The debate concerning the original adoption of the 'proper form' requirement reveals that the framers of art. 48 were primarily concerned with avoiding errors of draftmanship," and did not intend that it "become an inquiry into substance").

In Mazzone, 432 Mass. at 530, we rejected a similar challenge to the form of an initiative petition in which the plaintiffs claimed that the definition of a key term was "circular" and "mystifying." We explained that "[n]either the petitioners' skill at legislative drafting, the potential constitutional infirmities of an arbitrary or vague statute, nor the potential effects of a measure on current law are reviewable matters under art. 48." Id. "[T]he pros and cons of the measure, including its possible legal flaws," Abdow, 468 Mass. at 508, are not before us at this time.

The Oberlies plaintiffs also challenge an exception included in Initiative Petition 17-07 that provides that "[t]he requirements of this act, and its enforcement, shall be suspended during a [S]tate or nationally declared public health emergency." They argue that voters will misread this section, and believe that the proposed act's requirements will be suspended under any situation that commonly might be described as an emergency, such as food poisoning at a popular restaurant

or a multivehicle accident on the expressway, rather than only under the limited circumstances of a State or nationally declared public health emergency. The proposal's language, however, plainly states that its requirements would be suspended only during a State or nationally declared public health emergency. This claim does not assert any "errors of draftmanship," see Nigro, 402 Mass. at 446, but, rather, appears to challenge the narrow scope of the proposed exception. "The plaintiffs' disagreements with the petition's purpose, the methods chosen to achieve that purpose and the possible effects" are not grounds upon which to reject an initiative petition. See Mazzone, 432 Mass. at 529.

Finally, the Oberlies plaintiffs argue that Initiative Petition 17-07 is fatally flawed because it does not adequately set forth how the workforce reduction restriction will be enforced, or the grounds for determining whether a violation has occurred. They assert that the proposal's failure to answer these questions will make the proposed act difficult to implement, and "deprive voters of the ability to make an informed electoral choice." The proposal, however, if approved, would empower the HPC to "promulgate regulations governing and ensuring the implementation and operation of th[e] act." A petition does not lack the proper form solely because, at this stage, the details of its administration are unclear. See

Mazzone, 432 Mass. at 530 ("The plaintiffs' argument that 'a statutory scheme that demands arbitrary enforcement by providing no guidance to those who must administer it states no law' misconstrues the constitutional requirements for the enactment of legislation by the people or the Legislature").  "[T]he proper time for deciding definitively whether the measure has the desired legal effect will come if and when the measure is passed."  Abdow, 468 Mass. at 508.  That the full consequences of the proposed act would be fleshed out after its passage does not render its form improper.  See id. at 509-510.

As a result, the Attorney General was correct in determining that Initiative Petition 17-07 is in a proper form for submission to the voters, pursuant to art. 48.

3.  Conclusion.  We remand the matter to the county court for entry of a judgment declaring that the Attorney General's decisions to certify Initiative Petition 17-07, and declining to certify Initiative Petition 17-08, were in compliance with the requirements of art. 48.

So ordered.