GAZIANO, J.
*311 **781 The Attorney General certified as suitable for printing on the 2018 Statewide ballot an initiative petition that would ask voters in the Commonwealth to decide whether to amend the existing flat tax rate mandated by the Massachusetts Constitution in order to impose a graduated tax on residents with incomes in excess of $1 million. The language of Initiative Petition 15-17 also provides that, "subject to appropriation" by the Legislature, all revenues received from the proposed tax "shall" be earmarked for two budgetary purposes: education and transportation.
The plaintiffs, registered voters in the Commonwealth, seek to exclude the petition from the ballot on the ground, inter alia, that it does not meet the related subjects requirement of art. 48 of the Amendments to the Massachusetts Constitution. In addition, the plaintiffs contend that the petition would constitute a "specific appropriation of money from the treasury of the commonwealth," contrary to the explicit prohibition in art. 48, The Initiative, II, § 2, of the Amendments to the Massachusetts Constitution against **782 such appropriations, and that the drafters of art. 48, at the Constitutional Convention of 1917-1918, did not intend that tax rates be set by initiative petitions.[3] The plaintiffs filed a complaint in the county court challenging the Attorney General's certification of the initiative petition and seeking to enjoin the Secretary of the Commonwealth (Secretary) from placing the petition on the 2018 Statewide ballot. The single justice reserved and reported the case for consideration by the full court.
We conclude that the initiative petition should not have been certified by the Attorney *312 General as "in proper form for submission to the people," because, contrary to the certification, the petition does not contain only subjects "which are related or which are mutually dependent," pursuant to art. 48, The Initiative, II, § 3, of the Amendments to the Massachusetts Constitution, as amended by art. 74 of the Amendments.[4]
1. Background. a. Article 44. To place the issue in context, a brief description of the mandatory flat tax rate in the Massachusetts Constitution is necessary. Article 44 of the Amendments to the Massachusetts Constitution, ratified in 1915, allows the Legislature to levy a State income tax on Massachusetts residents at a "uniform rate." See Drapkin v. Commissioner of Revenue, 420 Mass. 333, 336, 649 N.E.2d 1094 (1995). Article 44 provides, in relevant part:
"Full power and authority are hereby given and granted to the general court to impose and levy a tax on income in the manner hereinafter provided. Such tax may be at different rates upon income derived from different classes of property, but shall be levied at a uniform rate throughout the commonwealth **783 upon incomes derived from the same class of property."
Pursuant to art. 44, the State income tax "must be calculated by applying a single, flat rate percentage to a particular class of income." Peterson v. Commissioner of Revenue, 441 Mass. 420, 427, 806 N.E.2d 78 (2004). As a result of this provision, therefore, the Legislature is precluded from imposing a graduated income tax on Massachusetts taxpayers. See Opinion of the Justices, 383 Mass. 940, 941-942, 423 N.E.2d 751 (1981) ; Opinion of the Justices, 266 Mass. 583, 588, 165 N.E. 900 (1929).
Over the past fifty years, a number of initiative petitions seeking to amend art. 44, in order to permit a graduated income tax, have been certified and presented to the voters. In 1962, 1968, 1972, and 1976, proposals to amend the flat tax rate were placed on the ballot by the Legislature; in 1994, the ballot initiative seeking to amend the flat tax was the product of a voter-initiated petition. In all five of these measures, the graduated income tax, alone, was the sole subject of the ballot question. In 1994, for example, the ballot question stated:
"This proposed constitutional amendment would require Massachusetts income tax rates to be graduated, in order to distribute the burden of the tax fairly and equitably. The proposed amendment would require the rates for taxpayers in higher income brackets to be higher than the rates for taxpayers in lower income brackets. The proposed amendment would also allow the state Legislature to grant reasonable exemptions and abatements and establish the number and range of tax brackets. The proposed amendment would eliminate from the Massachusetts Constitution the present requirement that income taxes must be levied at a uniform rate throughout the state upon incomes derived from the same class of property."
*313 Voters rejected this petition by a margin of sixty-five to twenty-eight per cent of votes cast. On the same ballot, voters also rejected, by a margin of sixty-five to twenty-seven per cent of votes cast, an initiative petition that a statute be enacted requiring graduated income tax rates.
b. Initiative Petition 15-17. By August 5, 2015, at least ten registered voters had filed with the Attorney General the initiative petition at issue here, entitled, "An Initiative Petition for An **784 Amendment to the Constitution of the Commonwealth to Provide Resources for Education and Transportation through an additional tax on Incomes in excess of One Million Dollars." The petition would amend art. 44 by adding the following:
"To provide the resources for quality public education and affordable public colleges and universities, and for the repair and maintenance of roads, bridges and public transportation, all revenues received in accordance with this paragraph shall be expended, subject to appropriation, only for these purposes. In addition to the taxes on income otherwise authorized under this Article, there shall be an additional tax of 4 percent on that portion of annual taxable income in excess of $1,000,000 (one million dollars) reported on any return related to those taxes. To ensure that this additional tax continues to apply only to the commonwealth's highest income residents, this $1,000,000 (one million dollar) income level shall be adjusted annually to reflect any increases in the cost of living by the same method used for federal income tax brackets. This paragraph shall apply to all tax years beginning on or after January 1, 2019."
On September 2, 2015, the Attorney General certified to the Secretary that the petition "is in proper form for submission to the people; that the measure is not, either affirmatively or negatively, substantially the same as any measure which has been qualified for submission to the people at either of the two preceding biennial state elections; and that it contains only subjects that are related or are mutually dependent and which are not excluded from the initiative process pursuant to Article 48, the Initiative, Part II, Section 2."
After the Attorney General's certification, the proponents of the initiative petition gathered and submitted sufficient additional signatures to the Secretary so that the Secretary transmitted the measure to the Legislature. See art. 48, The Initiative, II, §§ 1, 3, 4, as amended by art. 74. On May 18, 2016, more than one-quarter of the members of both houses of the Legislature voted in favor of the proposed constitutional amendment, and it was referred to the next legislative session. See art. 48, The Initiative, IV, § 4. On June 14, 2017, more than one-quarter of the members of both houses again voted to approve the proposed amendment. This litigation followed.
On October 3, 2017, the plaintiffs filed a complaint in the county court seeking a declaration pursuant to G. L. c. 214, § 1, **785 that the initiative petition does not comply with the requirements of art. 48; they also sought an order quashing the Attorney General's certification and an injunction preventing the Secretary from placing the initiative petition on the general election ballot to be put before the voters in November, 2018. Ten registered voters who support the petition were allowed to intervene in the case. The single justice then reserved and reported the matter for decision by the full court.
The plaintiffs contend that the Attorney General's certification of the petition was improper for three reasons. First, they argue that the petition combines "three very different subject matters: whether to *314 impose a graduated income tax, and whether to give preferential treatment in state spending to two unrelated subject matters-education and transportation," contrary to the requirement of art. 48, The Initiative, II, § 3, as amended by art. 74, that an initiative petition address only related or mutually dependent subjects. Second, the plaintiffs maintain that the earmarking of the tax revenues that would be raised by the new tax would violate the prohibition of art. 48 against imposing "specific appropriation[s]" by initiative petitions. See art. 48, The Initiative, II, § 2. Third, the plaintiffs assert that an initiative petition may not be used to usurp the Legislature's authority to tax, and that a petition to modify the Massachusetts Constitution is on a different footing in this regard from a petition to create a statute.
2. Standard of review. A challenge to the Attorney General's decision to certify an initiative petition is reviewed de novo. See Abdow v. Attorney Gen., 468 Mass. 478, 487, 11 N.E.3d 574 (2014). In reviewing a challenge to an initiative petition proposed by at least ten registered voters in the Commonwealth, we construe art. 48 in a manner "mindful that art. 48 establishes a 'people's process,' " Bates v. Director of the Office of Campaign & Political Fin., 436 Mass. 144, 154, 763 N.E.2d 6 (2002), quoting Buckley v. Secretary of the Commonwealth, 371 Mass. 195, 199, 355 N.E.2d 806 (1976), that "gives the people of Massachusetts the opportunity 'to enact statutes regardless of legislative opposition' " and to "move forward on measures which they deem[ ] necessary and desirable," regardless of legislative opposition. Bates, supra, quoting Citizens for a Competitive Mass. v. Secretary of the Commonwealth, 413 Mass. 25, 30, 594 N.E.2d 855 (1992). See Carney v. Attorney Gen., 451 Mass. 803, 814, 890 N.E.2d 121 (2008).
At the same time, however, we are obligated to safeguard the integrity of the initiative petition process by requiring that those **786 seeking to change the law strictly comply with art. 48. "[T]he provisions of art. 48 are mandatory rather than directory.... [W]hen [the people] ... seek to enact laws by direct popular vote they must do so in strict compliance with those provisions and conditions" (citations omitted). Opinion of the Justices, 422 Mass. 1212, 1219, 664 N.E.2d 792 (1996). See Hurst v. State Ballot Law Comm'n, 427 Mass. 825, 828, 696 N.E.2d 531 (1998) ("The State Constitutional Convention of 1917-1918 sought a balance between competing impulses toward direct versus representative democracy. The proper form and use of petitions is an important aspect of the balance art. 48 represents, and our review must respect that balance").
3. Discussion. The plaintiffs challenge the Attorney General's certification that Initiative Petition 15-17 contains only subjects "which are related or which are mutually dependent." Art. 48, The Initiative, II, § 3, as amended by art. 74.
a. Related subjects requirement. In deciding whether an initiative petition contains subjects "which are related or which are mutually dependent," we examine whether "the similarities of an initiative's provisions dominate what each segment provides separately so that the petition is sufficiently coherent to be voted on 'yes' or 'no' by the voters[.] That is the crux of the relatedness controversy." Carney v. Attorney Gen., 447 Mass. 218, 226, 850 N.E.2d 521 (2006) ( Carney I ). The mandate that an initiative petition contain a single "common purpose" arises because a voter, unlike a legislator, "has no opportunity to modify, amend, or negotiate the sections of a law proposed by popular imitative." Id. at 230, 231, 850 N.E.2d 521. A voter cannot "sever the unobjectionable *315 from the objectionable," and must vote to approve or reject an initiative petition in its entirety. Id. at 230, 850 N.E.2d 521. Accordingly, to avoid "abuse" of the process and confusion among voters, while an initiative petition may contain numerous subjects, it must embody one purpose, and "must express an operational relatedness among its substantive parts that would permit a reasonable voter to affirm or reject the entire petition as a unified statement of public policy." Id. at 230-231, 850 N.E.2d 521.
The language of art. 48 emerged from the Constitutional Convention of 1917-1918, "from which we may discern the conditions under which art. 48 came into existence, and how it appears then to have been received and understood by the convention, and ultimately, by the voters" (citation and quotations omitted). Carney I, 447 Mass. at 226, 850 N.E.2d 521. The requirement of art. 48 that an initiative petition must "contain[ ] only subjects ... which are **787 related or which are mutually dependent" was intended to balance the "interests of initiative petitioners and the interests of those who would ultimately vote on the petition." Abdow, 468 Mass. at 499, 11 N.E.3d 574.
The convention adopted the related subjects requirement in response to two concerns raised by the delegates: the potential for voter confusion and "the dangers of 'log-rolling,' "[5] which had given rise to harms in other States. Dunn v. Attorney Gen., 474 Mass. 675, 679-680, 54 N.E.3d 1 (2016). See Carney I, 447 Mass. at 226-227, 850 N.E.2d 521. Otherwise put, the relatedness requirements were intended to protect against petitions which include "as alluring a combination of what is popular with what is desired by selfish interests as the proposers of the measures may choose." Carney I, supra at 227, 850 N.E.2d 521, quoting 2 Debates in the Massachusetts Constitutional Convention 1917-1918, at 12 (1918) (Constitutional Debates). See Dunn, supra ; Hensley v. Attorney General, 474 Mass. 651, 652, 658, 53 N.E.3d 639 (2016) ; Gray v. Attorney General, 474 Mass. 638, 644-647, 52 N.E.3d 1065 (2016) ; Abdow, 468 Mass. at 498-499, 11 N.E.3d 574.
The relatedness requirement was imposed in its current form, mandating that initiative petitions contain only subjects that are "related" or "mutually dependent," after much debate among the delegates about how best to avoid "packaging proposed laws in a way that would confuse the voter," Carney I, 447 Mass. at 228, 850 N.E.2d 521, or otherwise be "misleading." See id. at 225, 227-230 & n.21, 850 N.E.2d 521.[6]
**788 "To prevent initiative petitions from *316 being exploited in this manner, the delegates considered potential limitations on their subject matter.... One delegate offered an amendment to require that '[n]o proposed law shall contain more than one subject,' which another delegate proposed modifying to state that a proposed law 'shall not contain unrelated subjects.' ... This modified amendment was adopted by the convention, and, after some reworking by the committee on form and phraseology, ultimately was approved as the provision in art. 48 ..., requiring the Attorney General to certify that a proposed measure 'contains only subjects ... which are related or which are mutually dependent.' " Dunn, 474 Mass. at 679-680, 54 N.E.3d 1, citing Carney I, 447 Mass. at 227-228, 850 N.E.2d 521 ; Constitutional Debates, supra at 12, 537, 567, 701-702.
We were first called upon to construe the "related subjects requirement" in 1941, in a petition involving education about birth control for married couples. See Opinion of the Justices, 309 Mass. 555, 560-561, 34 N.E.2d 431 (1941). In that case, we determined that the requirement that initiative petitions contain "only subjects ... which are related or which are mutually dependent" was met because "[t]he particular subjects of the proposed law appear[ed] to be germane to the general subject of prevention of pregnancy or conception, to such an extent, at least, that they [could not] rightly be said to be unrelated." Id. at 561, 34 N.E.2d 431.
Forty years later, we relied on that test in Massachusetts Teachers Ass'n v. Secretary of the Commonwealth, 384 Mass. 209, 221, 424 N.E.2d 469 (1981), quoting Opinion of the Justices, 309 Mass. at 561, 34 N.E.2d 431, in discussing the related subjects requirement of art. 48, The Initiative, II, § 3, as amended by § 74, where we concluded that the requirement that an initiative petition contain "only subjects ... which are related or which are mutually dependent," would be satisfied if "one can identify a common purpose to which each subject of an initiative petition can reasonably be said to be germane." Massachusetts Teachers Ass'n, supra at 219-220, 424 N.E.2d 469. We cautioned, however, that while "[i]t is not for the courts to say that logically and consistently other matters might have been included or that particular subjects might have been dealt with differently," "the general subject of an initiative petition cannot be so broad as to render the 'related subjects' " limitation meaningless. Id., citing Opinion of the Justices, supra. In 1996, in considering whether an initiative petition met the requirement of "relatedness,"
**789 defined as whether it violated "the art. 48 requirement that all subjects of an initiative be related or mutually dependent," the Justices again relied upon the test in Massachusetts Teachers Ass'n, supra, whether "one can identify a common purpose to which each subject of an initiative petition can reasonably be said to be germane." Opinion of the Justices, 422 Mass. at 1220, 664 N.E.2d 792.
Ten years later, in Carney I, 447 Mass. at 220, 226, 228, 850 N.E.2d 521, we examined the history of the constitutional debates on the "relatedness limitation," as it was enacted in its final form, requiring that an initiative petition "contain[ ] only subjects ... which are related or which are mutually dependent," and held that "[t]he plain wording of art. 48 and the context in which it was enacted demonstrate that the relatedness limitation is one *317 of many restrictions on the popular initiative process intended to avoid confusion at the polls and to permit citizens to exercise a meaningful choice when voting to accept or reject a proposed law."
In our subsequent decisions, we have continued to follow what has been known as the "related subjects" requirement or the "relatedness requirement." In Dunn, 474 Mass. at 679-680, 54 N.E.3d 1, we analyzed the "related subjects requirement," which we defined as the requirement of art. 48 that "a proposed measure 'contain[ ] only subjects.. which are related or which are mutually dependent," in terms of whether the two distinct provisions in the petition shared a "common purpose" as defined in Carney I, 447 Mass. at 226, 850 N.E.2d 521. In Hensley, we determined that an initiative petition "easily satisfie[d] the related subjects requirement of art. 48" because, first, its provisions met the requirements that their "similarities ... dominate what each segment provides separately so that the petition is sufficiently coherent to be voted on 'yes' or 'no' by the voters." Hensley, 474 Mass. at 658, 53 N.E.3d 639, quoting Carney I, supra. Second, the multiple provisions in the petition expressed "an operational relatedness among its substantive parts that would permit a reasonable voter to affirm or reject the entire petition as a unified statement of public policy." Hensley, 474 Mass. at 658, 53 N.E.3d 639, quoting Abdow, 468 Mass. at 501, 11 N.E.3d 574. We concluded that the petition met the relatedness requirement of art. 48 because it "[laid] out a detailed plan to legalize marijuana ... for adult use" and to create a system that would license, regulate, and tax retail sales. Hensley, supra.
Similarly, in Gray, 474 Mass. at 644-649, 52 N.E.3d 1065, in considering the "related subjects requirement," we determined that the subjects of the petition were not mutually dependent because they could **790 "exist independently," and then decided the matter relying on the "relatedness limitation" as defined in Carney I, 447 Mass. at 226, 850 N.E.2d 521, and concluded that the subjects had no "common purpose." In Abdow, 468 Mass. at 498-499, 11 N.E.3d 574, we concluded that the "proposed measure" did not violate the "so-called 'relatedness' or 'related subjects' requirement of art. 48, which states that an initiative petition must 'contain[ ] only subjects ... which are related or which are mutually dependent." We determined that the petition contained "a significant 'common purpose,' " and its provisions were "not so loosely tied together as to render the related subjects requirement meaningless, and [were] operationally related in a way that would 'permit a reasonable voter to affirm or reject the entire petition as a unified statement of public policy.' " Id. at 501, 11 N.E.3d 574. See Albano v. Attorney General, 437 Mass. 156, 161, 769 N.E.2d 1242 (2002) (discussing "the relatedness requirement" as whether "a petition contains only subjects 'which are related or which are mutually dependent' " and deciding that "entire petition" [with several distinctly separate provisions] shared "[a] common purpose" that was not "so broad as to render the 'related subjects' limitation meaningless" [citations omitted] ); Mazzone v. Attorney Gen., 432 Mass. 515, 529, 736 N.E.2d 358 (2000) (under subheading "[r]elated or mutually dependent subjects," discussing and determining that subjects of petition were "related to a single, common purpose" of expanding scope of drug treatment and drug abuse prevention programs).
As mentioned, in Gray, 474 Mass. at 648, 52 N.E.3d 1065, one of the few occasions in which we have concluded that a petition did not meet the related subjects requirement, we did discuss briefly, under the subheading of "[r]elatedness," whether two *318 subjects were mutually dependent, and concluded that they were not. In a lengthy discussion under the same subheading, we also considered "the core of the related subjects requirement," that is, whether the "initiative petition's provisions share a 'common purpose,' ... put slightly differently but making the same point, ... a 'unified statement of public policy' that the voters can accept or reject as a whole" (footnote omitted). Id. at 645-646, 52 N.E.3d 1065, quoting Massachusetts Teachers Ass'n, 384 Mass. at 219-220, 424 N.E.2d 469, and Carney I, 447 Mass. at 231, 850 N.E.2d 521. Since then, other than in quoting the language of art. 48, we have not had cause to address separately whether the subjects of a petition are "mutually independent." See Gray, supra at 644-649, 52 N.E.3d 1065.
As these cases demonstrate, the language "or which are mutually dependent" in the relatedness requirement does not lessen the **791 limitation that an initiative petition under art. 48, The Initiative, II, § 3, as amended by art. 74, must contain a single common purpose and express a unified public policy. Nor does it impose a separate requirement that may be satisfied even if the subjects of a petition are not related. The questions whether "the similarities of an initiative's provisions dominate what each segment provides separately so that the petition is sufficiently coherent to be voted on 'yes' or 'no' by the voters," and whether two or more provisions in an initiative petition "express an operational relatedness among its substantive parts that would permit a reasonable voter to affirm or reject the entire petition as a unified statement of public policy," are two sides of the same coin. See Carney I, 447 Mass. at 226, 230-231, 850 N.E.2d 521. See also Dunn, 474 Mass. at 680, 54 N.E.3d 1 ; Massachusetts Teachers Ass'n, 384 Mass. at 219, 424 N.E.2d 469.
"A constitutional amendment should be 'interpreted in the light of the conditions under which it ... [was] framed, the ends which it was designed to accomplish, the benefits which it was expected to confer and the evils which it was hoped to remedy.' " Mazzone, 432 Mass. at 526, 736 N.E.2d 358, quoting Tax Comm'r v. Putnam, 227 Mass. 522, 524, 116 N.E. 904 (1917). " 'Its words are to be given their natural and obvious sense according to common and approved usage at the time of its adoption,' although the historical context should not 'control[ ] the plain meaning of the language.' " Mazzone, supra, quoting General Outdoor Advertising Co. v. Department of Pub. Works, 289 Mass. 149, 158, 193 N.E. 799 (1935).
In its dictionary definition, "mutual" means "directed by each toward the other or others; reciprocal." Black's Law Dictionary 1178 (10th ed. 2014). In common usage, "mutual" is defined as "having the same relation each toward the other" and "of or pertaining to each of two or more; held in common; shared." Webster's New Universal Unabridged Dictionary 1270 (2003). A "dependent" is defined as "[s]omeone who relies on another for support; one not able to exist or sustain oneself without the power or aid of someone else," and "dependence" is defined as "[a] relationship between two ... things whereby one is sustained by the other or relies on the other for support or necessities." Black's Law Dictionary, supra at 531. In common usage, "dependent" also means "conditioned or determined by something else"; "contingent"; and "not used in isolation; used only in connection with other forms." Webster's New Universal Unabridged Dictionary, supra at 534.
While the word "or" is often used as a disjunctive, it also has a number of other meanings. The word "or" may be "used to **792 correct or rephrase what was *319 previously said." Webster's New Universal Unabridged Dictionary, supra at 1360. It is fundamental to statutory construction that the word "or" is disjunctive "unless the context and the main purpose of all the words demand otherwise."[7] Eastern Mass. St. Ry. v. Massachusetts Bay Transp. Auth., 350 Mass. 340, 343, 214 N.E.2d 889 (1966), citing Commonwealth v. Keenan, 139 Mass. 193, 194, 29 N.E. 477 (1885). See, e.g., Miller v. Miller, 448 Mass. 320, 329, 861 N.E.2d 393 (2007) (same); Bleich v. Maimonides Sch., 447 Mass. 38, 46-47, 849 N.E.2d 185 (2006) (same); Nuclear Metals, Inc. v. Low-Level Radioactive Waste Mgt. Bd., 421 Mass. 196, 212, 656 N.E.2d 563 (1995) (same). "Although the disjunctive 'or' may suggest separate meanings for the two terms ..., it does not require mutual exclusivity. The word 'or' commonly introduces a synonym or 'definitional equivalent.' " McCarthan v. Director of Goodwill Indus. Suncoast, Inc., 851 F.3d 1076, 1087 (2017), quoting A. Scalia & B.A. Garner, Reading Law: The Interpretation of Legal Texts 122 (2012). See 1A N.J. Singer & J.D. Shambie Singer, Statutes and Statutory Construction § 21.14 (7th ed. 2009). See also United States v. Harris, 838 F.3d 98, 105 (2d Cir. 2016), cert. denied, --- U.S. ----, 137 S.Ct. 840, (197 L.Ed.2d 79, 2017 ), quoting Reiter v. Sonotone Corp., 442 U.S. 330, 339, 99 S.Ct. 2326, 60 L.Ed.2d 931 (1979) ("In any event, even when striving to ensure separate meanings, the disjunctive canon does not apply absolutely, particularly where 'the context dictates otherwise' ").
In other words, while operationally related subjects need not be mutually dependent, "we need not pause to consider whether any subjects which are mutually dependent could ever be said not also to be related."
**793 Massachusetts Teachers Ass'n, 384 Mass. at 218 n.8, 424 N.E.2d 469. As discussed, the provision the delegates referred to as the "unrelated matters" provision, Constitutional Debates, supra at 960, was approved by the delegates, under that designation, when it comprised the phrase "shall not contain unrelated subjects." Id. at 856. The provision was adopted after much debate by the delegates on how to prevent particular misuses of the initiative process, and whether initiative petitions should be limited to a single subject. Id. at 12, 537, 567, 701-702. The words "or which are mutually dependent" were added at the last moment, when the "related subjects" language was "referred back" to the committee on form and phraseology. Constitutional Debates at 953. The committee "on its own initiative, moved the relatedness limitation from its 'isolated' position and incorporated it into the section of the final draft initiative amendment concerning *320 the Attorney General's certification duties" that the committee reported back to the delegates. See Carney I, 447 Mass. at 228, 850 N.E.2d 521, citing Constitutional Debates, supra at 1051. These changes were described by the delegates themselves as "unimportant" and as not affecting the meaning of the provision. Constitutional Debates, supra at 773, 911, 959-960. The delegates then adopted the final language without further debate. Id. at 1050-1051. Thus, the words "or which are mutually dependent" were added as a means of assisting, first, the Attorney General and, thereafter, the court, in language that was then well understood, to examine a petition to determine if its core purpose "dominate[s] what each segment provides separately so that the petition is sufficiently coherent to be voted on 'yes' or 'no' by the voters." Carney I, supra at 226, 850 N.E.2d 521. See Ashley v. Three Justices of the Superior Court, 228 Mass. 63, 81, 116 N.E. 961 (1917) ; County of Berkshire v. Cande, 222 Mass. 87, 90-91, 109 N.E. 838 (1915) ; Edwards v. Bruorton, 184 Mass. 529, 530-531, 69 N.E. 328 (1904) ; Nolan's Case, 122 Mass. 330, 332-333 (1877) ; Warren v. Mayor & Aldermen of Charlestown, 2 Gray 84, 99, 68 Mass. 84 (1854).
To construe the phrase "or which are mutually dependent" as eliminating the requirement of relatedness would be to vitiate the purpose of protecting the voters from misuse of the petitioning process for which it was enacted. "An amendment to the Constitution is one of the most solemn and important of instruments.... Its words should be interpreted in 'a sense most obvious to the common understanding at the time of its adoption,' because it is proposed for public adoption and must be understood by all entitled to vote." Carney I, 447 Mass. at 224, 850 N.E.2d 521, quoting Opinion of the Justices, 324 Mass. 746, 749, 85 N.E.2d 761 (1949). "We reject any restrictive **794 reading of art. 48, as amended, that results in a failure to give effect to the purpose for which its words were chosen." Carney I, supra at 225, 850 N.E.2d 521, quoting Hurst v. State Ballot Law Comm'n, 427 Mass. 825, 828, 696 N.E.2d 531 (1998). This is no doubt why, since its introduction, our jurisprudence construing art. 48, The Initiative, II, § 3, as amended by art. 74, has focused largely, or almost exclusively, on the question of "relatedness," rather than on "mutual dependence."
b. Application. With this guidance in mind, we turn to the petition at issue. Initiative Petition 15-17 contains three provisions on three distinct subjects presented as a single ballot question. First, the petition would amend the flat tax rate mandated by art. 44 to impose a graduated income tax on certain high-income taxpayers. Second, the petition would prioritize spending for public education by earmarking revenues raised by the new tax for "quality public education and affordable public colleges and universities." Third, the petition would prioritize spending for transportation by earmarking revenues raised by the new tax for "the repair and maintenance of roads, bridges and public transportation."
The parties understandably do not raise any arguments specifically concerning whether the provisions of the petition are mutually dependent. It is immediately apparent, however, that the three provisions are not mutually dependent. As discussed, petitions seeking to impose a graduated tax rate or a tax on specific high-income earners previously have been presented to the voters of the Commonwealth as stand-alone initiatives. It is also evident that funds for "quality public education" and "affordable public colleges and universities" could be raised and provided to educational *321 institutions separately from any expenditures on transportation, and that raising funds for "repair and maintenance of roads, bridges and public transportation" could proceed without any expenditures on education, at any grade level. Indeed, the dissent states as much when it notes that a differently worded petition, directing one-half of the funds raised to transportation and the other one-half to education, would remove from the Legislature "the latitude accorded it by the original proposed law to spend on the two identified areas as it saw fit, and instead would be limited to spending the funds raised specifically for each area regardless of the particular needs in each area."Post at 333. Because the provisions here can "exist independently," they are not "mutually dependent," just as in Gray, 474 Mass. at 648, 52 N.E.3d 1065, **795 where the diagnostic assessment tests and the reporting of the prior year's test results were not "mutually dependent" because they could "exist independently."[8]
Although she certified the subjects as sufficiently related, the Attorney General has not articulated a common purpose between these spending priorities, beyond the abstract determination that both purposes are "broad areas of public concern." The interveners, for their part, assert that prioritizing spending for education and transportation will "strengthen[ ] the Massachusetts economy and set[ ] a foundation for inclusive growth." Some of the amici characterize the petition as intended "for economic advancement and social mobility" of specific groups within the Commonwealth. The difficulty the proponents have in stating the purported purpose of the initiative petition is itself telling.
As a general matter, we agree with the Attorney General's **796 observation *322 that the subjects of education and transportation are areas of broad public concern, and efforts to improve them may be characterized as socially beneficial and for the common good. We also agree that education and transportation are among the many keys to "inclusive growth." Nonetheless, as we emphasized in Gray, 474 Mass. at 648, 52 N.E.3d 1065, the related subjects requirement is not satisfied by the ability to articulate a "conceptual or abstract bond" between diverse subjects, such as "broad areas of public concern" and "keys to inclusive growth." See Carney I, 447 Mass. at 230, 850 N.E.2d 521 ("It is not enough that the provisions in an initiative petition all 'relate' to some same broad topic at some conceivable level of abstraction"). See, e.g., id. at 226, 850 N.E.2d 521, citing Opinion of the Justices, 422 Mass. at 1220, 664 N.E.2d 792 (parties disputed whether common purpose of initiative petition was characterized broadly as "to make Massachusetts government more accountable to the people" or more narrowly as "legislative accountability"). As we have cautioned, a common purpose cannot be so overbroad as to "render the 'related subjects' limitation meaningless." Massachusetts Teachers Ass'n, 384 Mass. at 219, 424 N.E.2d 469.
There is "no single 'bright-line' test for determining whether an initiative meets the related subjects requirement." See, e.g., Dunn, 474 Mass. at 680, 54 N.E.3d 1 ; Hensley, 474 Mass. at 657, 53 N.E.3d 639 ; Abdow, 468 Mass. at 500, 11 N.E.3d 574 ; Carney I, 447 Mass. at 226, 850 N.E.2d 521. "On the one hand, the requirement must not be construed so narrowly as to frustrate the ability of voters to use the popular initiative as 'the people's process' to bring important matters of concern directly to the electorate; the delegates to the constitutional convention that approved art. 48 did, after all, permit more than one subject to be included in a petition, and we ought not be so restrictive in the definition of relatedness that we effectively eliminate that possibility and confine each petition to a single subject." Abdow, supra at 499, 11 N.E.3d 574, citing MassachusettsTeachers Ass'n, 384 Mass. at 219-229 and nn.9, 10, 424 N.E.2d 469. "On the other hand, relatedness cannot be defined so broadly that it allows the inclusion in a single petition of two or more subjects that have only a marginal relationship to one another, which might confuse or mislead voters, or which could place them in the untenable position of casting a single vote on two or more dissimilar subjects." Abdow, supra, citing generally Carney I, supra at 224-232, 850 N.E.2d 521.
In Gray, 474 Mass. at 640-643, 52 N.E.3d 1065, for example, the Attorney General certified an initiative petition which purported to address related subjects in the area of educational reform. The petition **797 sought to end the use of "Common Core" educational standards, and also would have required the annual release of the prior year's comprehensive assessment tests. Id. at 640-643, 52 N.E.3d 1065. Finding "the twin educational facets of curriculum and assessment ... inextricably coupled," the Attorney General determined that the provisions were "operationally related" to serve a "common purpose of imposing 'new procedural requirements on the development and implementation of educational standards.' " Id. at 648, 52 N.E.3d 1065. In considering whether the questions were sufficiently related for purposes of art. 48, we noted that the two subjects of curriculum content and comprehensive assessments-which test knowledge of the curriculum-were connected at a "conceptual level." Id. Aside from this theoretical connection, however, we concluded that the two provisions addressed separate public policy issues: the *323 elimination of Common Core curriculum standards and the publication of assessment tests. We determined that it would be unfair to place voters in the untenable position of casting a single vote on two dissimilar subjects, which each happened broadly to pertain to aspects of educational reform.
Similarly, in Carney I, 447 Mass. at 224, 232, 850 N.E.2d 521, we rejected the Attorney General's certification of two unrelated subjects that had been grouped together and designated as a provision to promote "the more humane treatment of dogs." The initiative petition in that case, entitled "An Act to protect dogs," proposed to expand criminal sanctions against those who abuse dogs, and to dismantle the dog racing industry. Id. at 219-222, 850 N.E.2d 521. We concluded that the provisions did not "express an operational relatedness among its substantive parts that would permit a reasonable voter to affirm or reject the entire petition as a unified statement of public policy." Id. at 230-231, 850 N.E.2d 521. As for the likely impact of that initiative petition at the polls, we observed, "The voter who favors increasing criminal penalties for animal abuse should be permitted to register that clear preference without also being required to favor eliminating parimutuel dog racing. Conversely, the voter who thinks that the criminal penalties for animal abuse statutes are strong enough should not be required to vote in favor of extending the reach of our criminal laws because he favors abolishing parimutuel dog racing." Id. at 231, 850 N.E.2d 521. Likewise, in Opinion of the Justices, 422 Mass. at 1220-1221, 664 N.E.2d 792, we concluded that the stated common purpose of "legislative accountability" was insufficient to bind together disparate provisions in a petition that was designed to address compensation for legislators and the **798 inspection of records kept by the commissioner of veterans' services.
By contrast, in Dunn, 474 Mass. at 676, 682, 54 N.E.3d 1, we concluded that an initiative petition prohibiting (1) the confinement of egg-laying hens, calves raised for veal, and breeding pigs on a farm "in a cruel manner," and (2) the sale of eggs or meat produced from animals so confined contained matters that were sufficiently related to satisfy art. 48. The opponents of the initiative petition in that case maintained that the Attorney General's certification of the petition was improper because the farm provisions and the sales provisions addressed different public policies. Id. at 681, 54 N.E.3d 1. They argued that it would be unfair to ask voters to choose between banning certain farming methods and requiring retailers to alter their purchasing decisions. Id. We determined that "[b]oth the farm provision and the sales provision share a common purpose of preventing farm animals from being caged in cramped conditions." Id. Moreover, the two provisions complemented each other "in the means of accomplishing this common purpose." Id.
Examination of the diverse subjects of Initiative Petition 15-17, by contrast, discloses no "operational relatedness among its substantive parts" (citation omitted), Dunn, 474 Mass. at 680, 54 N.E.3d 1, and we are unable to discern a common purpose or unified public policy that the voters fairly could vote up or down as a whole. The two subjects of the earmarked funding themselves are not related beyond the broadest conceptual level of public good. In addition, they are entirely separate from the subject of a stepped rather than a flat-rate income tax, which, by itself, has been the subject of five prior initiative petitions. Because a reasonable voter could not fairly accept or reject the petition as a unified statement of public *324 policy, Initiative Petition 15-17 does not meet the relatedness requirement set forth in art. 48, The Initiative, II, § 3, as amended by art. 74.[9] Including it on the ballot would place a reasonable voter in the "untenable position of casting a single vote on two or **799 more dissimilar subjects." See Abdow, 468 Mass. at 499, 11 N.E.3d 574.
The Attorney General maintains that "[t]he reasonably cognizant voter, simply by reading the text of the petition, is on alert that, if she objects to how this new revenue will be raised or spent, she should vote 'no' on the measure." This view would leave a voter who favored a graduated income tax but disfavored earmarking any funds for a specific purpose, for example, in the untenable position of choosing which issue to support and which must be disregarded. A voter who favored designating specific State funds for schools and transportation (subject to legislative appropriation), but not a graduated income tax, would be confronted with the same conundrum. A voter who commuted to work on an unreliable subway line, but who did not have school-aged children and was unconcerned about public education, might want to prioritize spending for public transportation, without devoting additional resources to public education, but would be unable to vote for that single purpose. A parent of young children, who lived in a rural part of the Commonwealth and did not own a motor vehicle, would be unable to vote in favor of prioritizing funding for early childhood education without supporting spending for transportation.[10] See Carney I, 447 Mass. at 231, 850 N.E.2d 521. Placing voters in the untenable position of either supporting or rejecting two important, but diverse, spending priorities, accompanied, **800 in either case, by a major change in tax policy, is "the specific misuse of the initiative process that the related subjects requirement was intended *325 to avoid." See Gray, 474 Mass. at 649, 52 N.E.3d 1065. "We are not free to temper the stringent formal limitations adopted by the people to ensure the integrity of the initiative process." Carney I, 447 Mass. at 224-225, 850 N.E.2d 521.
In essence, the dissent raises three issues. The dissent argues that: (1) a taxing proposition and a funding proposition cannot be separated and are always mutually dependent; (2) if the subjects of a petition are mutually dependent, there is no concern about the possibility of misleading or confusing the voters, and thus no need for consideration whether the petition expresses a single common purpose; and (3) the decision in this case that the provisions are neither related nor mutually dependent deprives the voters of their right to express an opinion on the petition.
The gravamen of the dissent's argument is that any collection of provisions that would tax any number of different sources, and would provide funds to some indeterminate list of distinct entities and purposes, should be placed before the voters, because the list of provisions would be "mutually dependent," and therefore inseparable; in this view, removing any one of the taxing sources or funding priorities would fundamentally alter the proposed law. The problem with this is that, at the time of the 1917-1918 Constitutional Convention, this court had established that a taxing provision establishing a source of funds, and a spending provision, could be separated. See Edwards, 184 Mass. at 530-532, 69 N.E. 328.
In addition, in this view, there is no requirement of a common purpose or a coherent statement of public policy that the voters can accept or reject as a whole. Because the provisions are inseparable, the dissent would have it, there is no concern about logrolling, or that the voters would be confused, misled, or placed in the untenable position of having to choose between two or more dissimilar subjects in casting a single vote. Thus, petitions that contain only "mutually dependent" provisions, as crafted by the proponents of the petitions, would be insulated from the protections that art. 48 was intended to provide. In particular, any petition containing provisions for both taxing and spending would be shielded from review by the Attorney General and, thereafter, the courts, to determine whether the proposed law presented a single statement of public policy, suitable to be placed before the voters. Taken to its logical conclusion, merely by adding to each provision a statement that the provision is intended **801 to be part of a particular package, and cannot stand on its own, petitioners would be able to guarantee that none of their petitions were subject to any sort of meaningful review. This would leave the question of relatedness, which was so intensely debated by the delegates to the 1917-1918 Constitutional Convention, on the cutting room floor.
Lastly, the dissent argues that construing the requirement of related or mutually dependent subjects as required under art. 48, The Initiative, II, § 3, as amended by art. 74, and, therefore, concluding that the petition is not suitable to be placed on the ballot, deprives the voters of the Commonwealth of the right to "express their opinion on a one-section, four-sentence petition." Post at 328. To the contrary, however, a decision to place before the voters three distinct policy provisions, yet permit them only to accept, or reject, all three as a package, would deprive the voters of the Commonwealth of their right "to exercise a meaningful choice when voting to accept or reject a proposed law." Carney I, 447 Mass. at 220, 850 N.E.2d 521. They would be unable to express a reasoned view on each distinct provision, independently, and on its own merits.
*326 Moreover, while the dissent asserts that the petitioners have an absolute "right" to place before the voters "this petition," in contrast to some other law that would be proposed if any of the provisions were not included, there is no such right. Article 48 was designed precisely to prevent any conceivable collection of provisions from being presented to the voters. See Carney I, 447 Mass. at 220-222, 850 N.E.2d 521. The relatedness requirement of the language in art. 48, The Initiative, II, § 3, as amended by art. 74, was intended to balance the "interests of initiative petitioners and the interests of those who would ultimately vote on the petition." Abdow, 468 Mass. at 499, 11 N.E.3d 574. In other words, art. 48 was designed to safeguard the rights of the voters to be presented with a coherent, single statement of public policy, rather than be misled by efforts to "wheedle or deceive [them] into granting the privileges that our representatives never would permit" by presenting "measures that become law through the ... wording of titles or ... catchy provisions ... that the people had previously rejected." Carney I, 447 Mass. at 227 n.20, 850 N.E.2d 521, quoting Constitutional Debates, supra at 567. It is hard to view a proposed "constitutional amendment" that one of its proponents said was deliberately "very differently constructed" from prior similar amendments, and where "because it is focused specifically on money for education and transportation **802 will stand a better chance of being approved," as other than the precise type of wheedling and deceiving that the delegates had in mind when they adopted the relatedness requirement. See note 10, supra.
"Neither the Attorney General nor this court is required to check common sense at the door when assessing the question of relatedness. The relatedness limitation of art. 48 must not be permitted to drift from its intent to secure to voters the right to enact a uniform statement of public policy through exercising a meaningful choice in the initiative process." Carney I, 447 Mass. at 232, 850 N.E.2d 521.
Conclusion. The matter is remanded to the county court, where a judgment shall enter declaring that the Attorney General's certification of Initiative Petition 15-17 is not in compliance with the related subjects requirement of art. 48 and the petition is not suitable to be placed on the ballot in the 2018 Statewide election.
So ordered.

See Bates v. Director of the Office of Campaign & Political Fin., 436 Mass. 144, 155-156, 763 N.E.2d 6 (2002), citing D.B. Magleby, Direct Legislation: Voting on Ballot Propositions in the United States 20-25 (1984), and 2 Debates in the Massachusetts Constitutional Convention 1917-1918, at 3-16 (1918) (Constitutional Debates).

We acknowledge the amicus briefs of the New England Legal Foundation; the Pioneer Institute, Inc., and the Tax Foundation; and the Chamber of Commerce of the United States of America, in support of the plaintiffs. We acknowledge the amicus brief of the mayors of Somerville, Lawrence, Lynn, Medford, New Bedford, and Northampton; the amicus brief of the Ballot Initiative Strategy Center; the amicus brief of the Alliance for Business Leadership; and the amicus brief of the Center on Budget and Policy Priorities and the Institute on Taxation and Economic Policy, in support of the defendants. We also acknowledge the amicus brief of Adela Gonzalez; Zuleyka Hernandez; Ayomide Olumuyiwa, Greenroots, Inc.; and Alternatives for Community & Environment, Inc.

"Logrolling" is the "practice of including several propositions in one measure or proposed constitutional amendment so that the ... voters will pass all of them, even though these propositions might not have passed if they had been submitted separately." Dunn v. Attorney Gen., 474 Mass. 675, 679, 54 N.E.3d 1 (2016), quoting Carney v. Attorney Gen., 447 Mass. 218, 219 n.4, 850 N.E.2d 521 (2006) (Carney I ).

As an example of impermissible log-rolling, the delegates to the convention debated a provision placed before voters in Oregon through an initiative process:
"But, sir, you now invite the self-seekers who cannot get their legislation through the General Court to turn to the people whom they may wheedle or deceive into granting the privileges that our representatives never would permit. I have time to refer but incidentally to the measures that become law through the blind wording of titles or to catchy provisions, as illustrated by a case in Oregon, where, in order to secure the passage of the single tax, there was hitched to the front of it, like a locomotive to the front of a freight train, a proposal that there should be no more poll or head taxes. The important part of them had been abolished for years, but nevertheless that proposal hauled the heavy freight through and put into the Constitution of Oregon the single-tax proposition that the people had previously rejected."
Carney I, 447 Mass. at 227 n.20, 850 N.E.2d 521, quoting Constitutional Debates, supra at 567.

In Gaynor's Case, 217 Mass. 86, 89-90, 104 N.E. 339 (1914), the court observed:
"It is argued that 'or' in the clause quoted from [St. 1911, c. 751,] Part V, § 2, should be construed to mean 'to wit,' or identity with or explanation of that which goes before. Sometimes it is necessary to attribute this signification to the word in order to effectuate the plain legislative purpose. Commonwealth v. Grey, [2 Gray 501, 68 Mass. 501 (1854) ]. Brown v. Commonwealth, 8 Mass. 59 [ (1811) ]. It often is construed as 'and' in order to accomplish the intent manifested by the entire act or instrument in which it occurs.... It is not synonymous with 'and' and is to be treated as interchangeable with it only when the obvious sense requires it, or when otherwise the meaning is dubious. But the word 'or' in its ordinary use and also in accurate meaning is a disjunctive particle. It marks an alternative and not a conjunctive. It indicates one or the other of two or several persons, things or situations and not a combination of them.... It is construed as having a different meaning only when the context and the main purpose to be accomplished by all the words used seems to demand it."

Even if we were to accept the argument that the proposed spending provisions are dependent upon a particular funding mechanism-the proposed tax-that would not change the evident fact that the proposed tax can stand on its own, and neither spending provision depends upon the other. Moreover, that the two funding provisions rely on a particular source of funds does not make the provisions "mutually dependent." At the time of the Constitutional Debates of 1917-1918, it was well established that the source of funds for a desired public expenditure could be severed from the purpose of the expenditure, and that the two were not mutually dependent. See Edwards v. Bruorton, 184 Mass. 529, 530-532, 69 N.E. 328 (1904), citing Warren v. Mayor & Aldermen of Charlestown, 2 Gray 84, 99, 100, 68 Mass. 84 (1854), and compiling cases ("In statutes providing for the expenditure of money for the benefit of the public, containing an unconstitutional provision for raising money by taxation, it has been held in different jurisdictions that the invalid part may be disregarded and the substantial part enforced, leaving payment to be provided for in a constitutional way").
By the same token, in Mazzone v. Attorney General, 432 Mass. 515, 517, 736 N.E.2d 358 (2000), we considered a petition proposing an "[a]ct to expand the scope of the commonwealth's drug treatment program and provide funding through fines for drug violations and the forfeiture of assets used in connection with drug offenses." We concluded that the distinct taxing and funding provisions of the petition were "related to a single, common purpose. All provisions of the petition relate directly or indirectly to expanding the scope of the Commonwealth's drug treatment programs and, as the Attorney General aptly describes it, 'fairly' funding those programs. To that end, the various provisions of the petition expand the class of individuals entitled to diversion into the Commonwealth's drug treatment programs, provide a source of funds, 'fairly' obtained, for those programs, and direct the development of drug abuse prevention programs." Id. at 529, 736 N.E.2d 358. Accordingly, because the "fines" and "other proceeds" to be raised and the drug rehabilitation programs to be funded served the single common purpose of expanding access to drug treatment programs, the petition met the "relatedness" requirement of art. 48. See id. at 524, 529, 736 N.E.2d 358.

Given the result we reach, we need not address the plaintiffs' argument that the petition violates the provision in art. 48, The Initiative, II, § 2, that "[n]o measure ... that makes a specific appropriation of money from the treasury of the commonwealth ... shall be proposed by an initiative petition." See Associated Indus. of Mass. v. Secretary of the Commonwealth, 413 Mass. 1, 6-8, 595 N.E.2d 282 (1992) (prohibition on initiative petition that "removes public monies, and the decision how to spend them, from the control of the Legislature" is not violated where language of petition concerned raising of public revenues and petition included provision that such funds were designated for specific purposes "subject to" appropriation by Legislature). For similar reasons, we do not address the claim that the delegates to the Constitutional Convention of 1917-1918 did not intend that tax rates be set by initiative petition.

We are not entirely unaware of the possibility that, as the plaintiffs argue, these "broad areas of public concern" were added to the initiative petition as a means to "sweeten the pot" for voters. In discussing the differences between the prior, unsuccessful, petitions for constitutional amendments to the flat tax rate that were presented as single-issue petitions and this petition, then Senate President Stanley Rosenberg remarked, "In the past, constitutional amendments have been very differently constructed. This one because it is focused specifically on money for education and transportation will stand a better chance of being approved. And, also because it is very clear that it (affects) people who make more than $1 million in taxable income." See Tuthill, Backers of Proposed Tax Hike on Massachusetts Millionaires File Signatures, WAMC Northeast Public Radio (Dec. 2, 2015), http://wamc.org/post /backers-proposed-tax-hike-massachusetts-millionaires-file-signatures [https://perma.cc/6UR3-NHP6]. Thus, the focus of legislators, like Rosenberg, was specifically on proposals to appropriate funds for education and transportation, because those proposals would stand a better chance of being approved by voters who would be forced to disregard the elimination of the flat tax in order to approve publicly beneficial funding initiatives. This, of course, is precisely what art. 48, The Initiative, II, § 3, as amended by art. 74, seeks to prevent.